ATTORNEYS FOR APPELLANT
Archis A. Parasharami
Washington, D.C.

Harry W. Cappel
Nathan H. Blaske
Cincinnati, Ohio

Matthew S. Love
Indianapolis, Indiana

ATTORNEYS FOR AMICUS
CURIAE INDIANA BANKERS
ASSOCIATION, INC.
Theodore J. Nowacki
David J. Jurkiewicz
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE
ReCASA FINANCIAL GROUP, LLC
Christopher C. Hagenow
Sarah Stites Millspaugh
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE
RICK A. SANDERS
Donald L. Centers
Mary A. Slade
Carmel, Indiana



# In the
# Indiana Supreme Court

No. 48S04-1204-CC-00213

CITIMORTGAGE, INC.,

*Appellant (Intervenor/Cross-Claimant below),*

v.

SHANNON S. BARABAS A/K/A SHANNON
SHEETS BARABAS,

*Defendant below,*

ReCASA FINANCIAL GROUP, LLC,

*Appellee (Plaintiff below),*

AND RICK A. SANDERS,

*Appellee (Third-Party Defendant below).*

Appeal from the Madison Circuit Court, No. 48C01-0806-CC-00593
The Honorable Frederick R. Spencer, Judge

On Petition to Transfer from the Indiana Court of Appeals, No. 48A04-1004-CC-00232

**October 4, 2012**

**Massa, Justice.**

Shannon Barabas had two mortgages on her Madison County home. The second mortgagee foreclosed on the property without notice to the first. The first mortgagee sought to intervene and obtain relief from the foreclosure judgment, but the trial court denied its motion. We reverse.

**Facts and Procedural History**

### A. Mortgage Electronic Registration Systems, Inc. (MERS) and Its Role in the Mortgage Industry[1]

Traditional mortgages were folies à deux;[2] the cast of characters consisted solely of Borrower and Lender. See Ellen Harnick, Crisis in Housing and Housing Finance: What Caused It? What Didn't? What's Next?, 31 W. New Eng. L. Rev. 625, 626–27 (2009). Lender, a bank,

---

[1] We are mindful that "[a] judge shall not investigate facts in a matter independently, and shall consider only the evidence presented and any facts that may properly be judicially noticed." Ind. Code of Jud. Conduct, Rule 2.9(C) (2011). We are also aware, however, that the appellate brief format can, in certain circumstances, be ill-suited to provide the background information essential to a thorough and fair consideration of a case. Here, as we have done before, see, e.g., A.B. v. State, 885 N.E.2d 1223, 1224 (Ind. 2008), we include in our opinion some information found outside the trial record in published sources that we cite with specificity.

[2] From the French, meaning "double madness" or "the presence of the same or similar delusional ideas in two persons closely associated with one another." Webster's Third New International Dictionary 882 (1993); cf. William Shakespeare, Hamlet, act 1, sc. 3 ("Neither a borrower nor a lender be.").

raised funds through customer deposits and loaned those funds out to Borrower. See id. Lender retained both the mortgage and the promissory note until Borrower had paid his debt in full. Id. Today, a typical mortgage is better described as a mass delusion, in which Borrower and Lender are joined by Loan Servicer, Title Company, Mortgage Broker, Underwriter, Trustee, and various other characters that facilitate the negotiation of mortgages on the secondary market. See Christopher L. Peterson, Foreclosure, Subprime Mortgage Lending, and the Mortgage Electronic Registration System, 78 U. Cin. L. Rev. 1359, 1367–68 (2009–2010).

The change began in the 1970s with the invention of the mortgage-backed security, a financial instrument that allowed investors to trade mortgages in the same way that they traded stocks and bonds. David Messerschmitt, Note, Overview of the Subprime Mortgage Market, 27 Rev. Banking & Fin. L. 3, 3 (2007). First, a borrower works with a broker to obtain a loan from a lender, who receives credit from an investment bank to fund the loan. Id. The lender then sells the loan back to the investment bank, which bundles it together with a few thousand others and divides the bundle into shares. Id. These shares are sold to investors, who receive a certain amount of the income that the bundle earns every month when borrowers make their mortgage payments.[3] Id.

This process, called "securitization," used to require multiple successive assignments, each of which had to be recorded on the county level at considerable inconvenience and expense to the investment banks involved. Christopher L. Peterson, Two Faces: Demystifying the Mortgage Electronic Registration System's Land Title Theory, 53 Wm. & Mary L. Rev. 111, 116 (2011–2012). In the mid-1990s, seeking to ameliorate those evils, a consortium of

---

[3] The market for these securities grew precipitously in the early years of the twenty-first century before ultimately collapsing under the weight of a collective misapprehension that both the borrower default rate and the real estate appreciation rate would remain consistent; in reality, the former rose as sharply as the latter dropped. See Messerschmitt, supra, at 34; This American Life: The Giant Pool of Money, Chicago Public Radio (May 9, 2008).

investment banks created Mortgage Electronic Registration Systems, Inc. (MERS). Id. MERS maintains "a computer database designed to track servicing and ownership rights of mortgage loans anywhere in the United States." Peterson, Foreclosure, supra, at 1361. MERS member banks list MERS as both "nominee" for Lender and as "mortgagee" on their mortgage documents. Kevin M. Hudspeth, Clarifying Murky MERS: Does Mortgage Electronic Registration Systems, Inc., Have Authority to Assign the Mortgage Note in a Standard Illinois Foreclosure Action?, 31 N. Ill. U. L. Rev. 1, 9 (2010-2011). MERS member banks can then buy and sell the note among themselves without recording an assignment of the mortgage. Id. In the event of default, MERS simply assigns the mortgage to whichever member bank currently owns the note, and that bank forecloses on the borrower. Id.

Today, about 60 percent of the nation's residential mortgages are recorded in the name of MERS rather than in the name of the bank, trust, or company that actually has a meaningful economic interest in the repayment of the debt.[4] Peterson, Two Faces, supra, at 117. That figure includes the mortgage at issue in this case.

## B. The Irwin Mortgage

On August 8, 2005, Shannon S. Barabas took out a mortgage in the amount of $154,111 from Irwin Mortgage Corporation on property located at 8285 South Firefly Drive in Madison County, Indiana. The first page of the mortgage document includes the following provision:

> This Security Instrument is given to Mortgage Electronic Registration Systems, Inc. ("MERS"), (solely as nominee for Lender, as hereinafter defined, and Lender's successors and assigns), as mortgagee. MERS is organized and existing

---

[4] There is no public record of the real party in interest in these mortgages, and MERS does not require member banks to report transfers. Peterson, Two Faces, supra, at 127. The resulting paucity of information has caused significant confusion for banks, borrowers, and courts. Id.

under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS. Irwin Mortgage Corporation ("Lender") is organized and existing under the laws of The State of Indiana, and has an address of 10500 Kincaid Drive, Fishers, IN 46038.

App. at 88. The mortgage continues on to describe Irwin's rights:

This Security Instrument secures to Lender: (a) the repayment of the debt evidenced by the Note, with interest, and all renewals, extensions and modifications of the Note; (b) the payment of all other sums, with interest, advanced under paragraph 7 to protect the security of this Security Instrument; and (c) the performance of Borrower's covenants and agreements under this Security Instrument and the Note.

App. at 88–89. And MERS's rights:

Borrower does hereby mortgage, grant and convey to MERS (solely as nominee for Lender and Lender's successors and assigns) and to the successors and assigns to MERS, the following described property located in Madison County, Indiana . . . Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument; but, if necessary to comply with law or custom, MERS, (as nominee for Lender and Lender's successors and assigns), has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing or canceling this Security Instrument.

App. at 89. On August 19, 2005, Barabas's mortgage was recorded in the office of the Madison County Recorder.

### C. The ReCasa Mortgage and Foreclosure

On February 26, 2007, Barabas took a second mortgage on the Madison County property in the amount of $100,000. In this transaction, ReCasa Financial Group, Inc. played the role of both Lender and Mortgagee. On May 11, 2007, the ReCasa mortgage was recorded in the office of the Madison County Recorder. On July 23, 2007, Barabas and ReCasa executed a Note Modification increasing the amount of the principal to $129,600.

5

Barabas apparently fell behind on her obligation to ReCasa. On June 13, 2008, ReCasa filed suit against Barabas and Irwin[5] in the Madison Circuit Court. ReCasa requested, among other relief, foreclosure of the mortgage and a sheriff's sale of the property. After receiving service of process, Irwin filed a "Disclaimer of Interest" in the Madison Circuit Court on June 23, 2008, stating that it "disclaim[ed] any interest in the real estate which is the subject of the Plaintiff's Complaint." App. at 51.

Meanwhile, on July 15, 2008, Barabas filed a petition for bankruptcy in the United States Bankruptcy Court for the Southern District of Indiana. Perhaps unsurprisingly in light of her apparent financial situation, Barabas did not respond to ReCasa's foreclosure complaint, so on September 9, 2008, the trial court entered a default judgment against her. On September 16, after receiving notice that Barabas had been discharged of her debt in the federal bankruptcy proceeding, the Madison County trial court amended its default judgment and ordered that the Madison County property be sold in a sheriff's sale.

Back in federal court, on September 22, 2008, Citimortgage filed a motion for relief from automatic stay, alleging that it had "a security interest" in the Madison County property that pre-dated Barabas's July 15 bankruptcy petition. App. at 155. As one of Barabas's creditors, ReCasa received service of Citimortgage's motion. On September 23, ReCasa's counsel sent a letter to the attorney who had filed the motion on Citimortgage's behalf to inform him that ReCasa had foreclosed on the property. ReCasa's counsel enclosed copies of the complaint, the foreclosure commitment, and the amended default judgment. On October 29, the bankruptcy court entered an order discharging Barabas from personal liability on her debts.

---

[5] ReCasa also named Barabas's husband, Brian, in the lawsuit as guarantor for her debt. The claim against Brian Barabas is not at issue in this appeal.

The sheriff's sale occurred on January 23, 2009, and ReCasa purchased the property for $65,000. On March 4, 2009, ReCasa recorded the sheriff's deed in the office of the Madison County Recorder. On March 17, 2009, ReCasa sold the property to Rick A. Sanders.

**D. The Assignment of the Irwin Mortgage and Citimortgage's Intervention**

On April 1, 2009, MERS assigned the Irwin mortgage to Citimortgage, and that assignment was recorded in the office of Madison County Recorder on April 20. On October 23, 2009, Citimortgage filed a motion pursuant to Indiana Trial Rules 24(A) and 60(B) seeking to intervene in ReCasa's foreclosure lawsuit and requesting that the court modify its judgment "to provide that the judgment granted to ReCasa Financial is subject to the mortgage now held by Citimortgage, Inc." App. at 83. Citimortgage alleged that it was entitled to intervene of right and argued that the default judgment was void for lack of personal jurisdiction. Three days later, the court granted Citimortgage's motion to intervene and ordered that ReCasa's amended default judgment was "vacated and set aside to any determination of the interest held by Citimortgage." App. at 99.

On November 19, 2009, Citimortgage filed a motion to vacate the sheriff's deed. On December 8, 2009, Citimortgage filed its own foreclosure complaint and various cross-claims against Sanders and other parties. On December 23, 2009, ReCasa filed an objection to Citimortgage's motion to intervene.

On February 16, 2010, the trial court heard oral argument, and on March 18, it issued an order finding that "pursuant to Indiana Code 32-28-8-2," Citimortgage was bound by the amended default judgment because its assignment was never properly recorded. App. at 10. The court also found that "pursuant to Indiana Code 32-29-8-3, CitiMortgage [sic] failed to redeem the Real Estate within one year after the Judicial Sale." App. at 10. Accordingly, the court denied Citimortgage's motion and reinstated the amended default judgment.

7

Citimortgage appealed, and on May 17, 2011, the Court of Appeals affirmed. Citimortgage, Inc. v. Barabas, 950 N.E.2d 12, 13 (Ind. Ct. App. 2011). A divided panel held that Citimortgage's claim was statutorily precluded because it failed to intervene within one year after acquiring an interest in the property. Id. at 16 (citing Ind. Code § 32-29-8-3). It also held that MERS was not entitled to independent notice of ReCasa's foreclosure action because MERS held only "bare legal title to the mortgage." Id. at 17–18. Judge Brown dissented from the majority opinion on both points. As to the timing of Citimortgage's intervention, Judge Brown noted that "any assignee or transferee" may redeem property for up to one year after the sale, and Citimortgage's intervention was within that statutory period. Id. at 18 (citing Ind. Code § 32-29-8-3). As to MERS's interest, Judge Brown noted that both the language of the mortgage, which referred to MERS as both "nominee" and "mortgagee," and MERS's assignment to Citimortgage tended to show "that MERS had a real interest in the Property." Id. at 19.

On rehearing, the court noted "that the one-year redemption period [in Indiana Code § 32-29-8-3] begins after the sale of the property, not after Citi[mortgage] first acquired interest in the property." Citimortgage, Inc. v. Barabas, 955 N.E.2d 260, 261 (Ind. Ct. App. 2011). The court, however, reaffirmed its opinion as to the result and the nature of MERS's interest. Judge Brown reiterated her dissent.

We granted transfer, 967 N.E.2d 1032 (Ind. 2012) (table), thereby vacating the opinion of the Court of Appeals. Ind. Appellate Rule 58(A). We now reverse the trial court.

## Standard of Review

As prologue, we note that "Trial Rule 24(C) expressly recognizes the right of a party to intervene after judgment for the purposes of presenting a motion under Trial Rule 60." State Farm Mut. Auto. Ins. Co. v. Hughes, 808 N.E.2d 112, 116 (Ind. Ct. App. 2004). A party seeking to intervene under Rule 24(C) must fulfill the requirements of either Rule 24(A) or (B).

8

A trial court is required, as a matter of right, to grant a party's timely motion to intervene if the party shows (1) an interest in property which is the subject of the action, (2) that disposition of the action may practically impair that interest, and (3) that no existing party is adequately representing the moving party's interest. Ind. Trial Rule 24(A)(2). The trial court has discretion to determine whether a prospective intervenor has met its burden. Thus, we review the trial court's ruling on a motion to intervene for abuse of discretion and assume that all facts alleged in the motion are true.

Similarly, the propriety of relief under Indiana Trial Rule 60(B) is a matter entrusted to the trial court's equitable discretion. Shotwell v. Cliff Hagan Ribeye Franchise, Inc., 572 N.E.2d 487, 489 (Ind. 1991). We review the exercise of that discretion only for abuse, which "may occur if the trial court's decision is clearly against the logic and effect of the facts and circumstances before the court, or if the trial court has misinterpreted the law," McCullough v. Archbold Ladder Co., 605 N.E.2d 175, 180 (Ind. 1993), but we also note "the disfavor in which default judgments are held." Hughes, 808 N.E.2d at 116. "A default judgment is an extreme remedy and is available only where a party fails to defend or prosecute a suit." Id. Courts should guard against the use of a default judgment as "a trap . . . set by counsel to catch unsuspecting litigants." Id. Whenever possible, courts should decide cases on their merits.

Finally, the fact that the trial court's decision here consists of a wholesale adoption of one party's proposed findings of fact and conclusions of law does not alter the applicable standard of review. See Wrinkles v. State, 749 N.E.2d 1179, 1188 (Ind. 2001).

**Citimortgage Has a Right to Intervene**

Citimortgage brought its motion to intervene under Indiana Trial Rule 24(A), alleging that it had an interest in this case sufficient to entitle it to intervene as of right. We agree.

9

**A. Citimortgage Has a Property Interest at Stake**

As a threshold matter, Citimortgage argues that Sanders and ReCasa waived the right to challenge MERS's alleged property interest by failing to raise that issue in the trial court. As a prevailing party, however, ReCasa may defend the trial court's ruling on any grounds, including grounds not raised at trial.[6] Thus, we address the merits of this issue.

In its motion, Citimortgage premised its right to intervene on its interest in the Madison County property. See Ind. Tr. R. 24(A)(2). Citimortgage alleged that it obtained its interest in the Madison County property mortgage from MERS, stating variously that it is the "successor in interest to MERS" and "the assignee of MERS." App. at 83–84. The assignee of rights under a contract stands in the shoes of the assignor and can assert any rights that the assignor could have asserted. Lake Cnty. Trust Co. v. Household Merch., Inc., 511 N.E.2d 512, 514 (Ind. Ct. App. 1987). Neither party disputes the validity of the April 1, 2009 assignment from MERS to Citimortgage. Citimortgage's interest is thus dependent upon MERS's interest, which arises from the original mortgage contract. We turn now to the interpretation of that contract.

The ultimate goal of any contract interpretation is to determine the intent of the parties at the time that they made the agreement. First Fed. Sav. Bank of Indiana v. Key Mkts., Inc., 559 N.E.2d 600, 603 (Ind. 1990). We begin with the plain language of the contract, reading it in context and, whenever possible, construing it so as to render each word, phrase, and term meaningful, unambiguous, and harmonious with the whole. Trustcorp Mortg. Co. v. Metro Mortg. Co., Inc., 867 N.E.2d 203, 213 (Ind. Ct. App. 2007). "A contract is ambiguous if a reasonable person would find the contract subject to more than one interpretation." Fackler v.

---

[6] In any event, Sanders did raise this argument in the trial court. On February 16, 2010, in a hearing in the Madison Circuit Court, Sanders's counsel argued that MERS was not entitled to service because the mortgage stated that MERS was only a nominee for the lender and that only the lender was entitled to notice.

Powell, 891 N.E.2d 1091, 1096 (Ind. Ct. App. 2008). If we find ambiguous terms or provisions in the contract, "we will construe them to determine and give effect to the intent of the parties at the time they entered into the contract." George S. May Int'l Co. v. King, 629 N.E.2d 257, 260 (Ind. Ct. App. 1994) (internal citations omitted), trans. denied.

### 1. The Mortgage Contract Is Ambiguous

The contract describes MERS as both "nominee for Lender" and "mortgagee" but does not include a definition of either of those terms. App. at 88. As to the first term, Black's Law Dictionary defines "nominee" as "[a] person designated to act in place of another, usu[ally] in a very limited way" and "[a] party who holds bare legal title for the benefit of others or who receives and distributes funds for the benefit of others." Black's Law Dictionary 1149 (9th ed. 2009). Webster's Dictionary defines "nominee" as "a person in whose name a stock or registered bond certificate is registered but who is not the actual owner." Webster's Dictionary, supra, at 1535. Here, Irwin has designated MERS to hold "bare legal title" to the mortgage and to act on its behalf in matters such as foreclosure and cancellation, but MERS is not the actual owner of the note. Thus, all of these definitions are consistent with MERS's actual role in the mortgage industry generally and in the Barabas mortgage specifically. They are also consistent with an agency relationship. Oil Supply Co., Inc. v. Hires Parts Serv., Inc., 726 N.E.2d 246, 248 (Ind. 2000) (defining agent as "one who acts on behalf of some person, with that person's consent and subject to that person's control").

As to the second term, Black's Law Dictionary defines "mortgagee" as "the mortgage creditor, or lender." Black's Law Dictionary, supra, at 1104. Webster's Dictionary defines "mortgagee" as "a person who takes a mortgage on another's property as security for a debt or obligation." Webster's Dictionary, supra, at 1472. These definitions are less promising. The mortgage clearly states that MERS is not the Lender; rather, Irwin is the Lender. What is more, agency law dictates that MERS cannot be both an agent and a principal with respect to the same right (here, the right to receive service of process in a foreclosure proceeding). Restatement (3d) of Agency §§ 1.01–.02 (2006).

11

The terms "nominee" and "mortgagee," as used in the Barabas mortgage contract, conflict with each other. A reasonable person, upon reading the contract, could find that the contract is subject to more than one interpretation. It is therefore ambiguous, so we must turn to evidence of the parties' intent in order to properly construe the ambiguous terms.

### 2. The Parties Intended to Designate MERS as the Lender's Agent

The mortgage contract states that MERS has "legal title to the interests granted by Borrower in this Security Instrument." App. at 89. It also states that MERS may exercise many of Lender's rights, including the right to foreclose and sell. Foreclosure proceedings are initiated in the form of a lawsuit in Indiana, and the right to file a lawsuit is a "constitutionally recognized property interest." Phillips Petroleum Co. v. Shutts, 472 U.S. 797, 807 (1985).

Additionally, MERS's own rules of membership state that "[e]ach Member hereby appoints 'Mortgage Electronic Registration Systems, Inc.,' as its nominee (as a limited agent) with respect to each mortgage that such Member registers on the MERS® System." MERSCORP, INC., Rules of Membership, R. 2, § 6.[7] The rules state further that MERS will comply with any instructions it receives from its principals regarding registered mortgages. Id. Most pertinently, the rules state that MERS "shall within two (2) business days forward to the appropriate Member or Members . . . all properly identified notices, payments, and other correspondence" related to mortgages for which MERS serves as the record mortgagee. Id. at R. 3, § 1. Much in the same way that a nonresident who drives a car in Indiana appoints the Indiana Secretary of State as his or her agent for service of process in any resultant tort claim, see Ind. Code § 34-33-3-1(b), a MERS member bank appoints MERS as its agent for service of process in any foreclosure proceeding on a property for which MERS holds the mortgage.

---

[7] As of July 5, 2012, these rules were available at http://www.mersinc.org/Foreclosures (link to "Rules of Membership"), but they have since been removed.

Taken together, MERS's rights under the terms of the Barabas mortgage and MERS's own rules indicate that the parties intended to designate MERS as an agent of the lender.[8] This agency relationship conferred various rights upon MERS, including rights that constitute protected property interests sufficient to entitle MERS—and Citimortgage standing in the shoes of MERS—to meet the first requirement for intervention of right.

Finally, ReCasa asserts that even if MERS did have rights under the mortgage contract, those rights were derivative of Irwin's rights and thus extinguished when Irwin disclaimed its interest. MERS, however, has an agency relationship with all of its member banks, not solely with Irwin. The mortgage contract states that MERS holds the mortgage "as nominee for Lender . . . *and Lender's successors and assigns*." App. at 88 (emphasis added). Thus, Irwin's disclaimer would have been effective against MERS's rights only if no other MERS member bank had an interest in the mortgage. There is no evidence that was the case; on the contrary, Citimortgage, a MERS member, claimed an interest. Thus, MERS's interest survived through its other principals, including Citimortgage.

### B. Disposition of the Foreclosure Case May Impair Citimortgage's Interest and No Other Party is Adequately Representing That Interest

There is little dispute as to the remaining two requirements for intervention. As to the first, if the default judgment is permitted to stand, Citimortgage's interest would be destroyed entirely. Thus, it is certain that resolution in Citimortgage's absence will "impair" its interest.

---

[8] Although their decision is not binding upon us, we are gratified to note that our federal colleagues share our view of the relationship between MERS and its member banks. See Mortg. Elec. Registration Sys., Inc. v. Estrella, 390 F.3d 522, 525 (7th Cir. 2004) ("[MERS] is a nominee only, holding title to the mortgage but not the note. Each lender appears to be entitled not only to payment as the note's equitable (and legal) owner but also to control any litigation and settlement."). Other state courts agree. See, e.g., Landmark Nat. Bank v. Kesler, 216 P.3d 158, 166 (Kan. 2009); Mortg. Elec. Registration Sys., Inc. v. Sw. Homes of Ark., Inc., 301 S.W.3d 1, 3–4 (Ark. 2009).

As to the second, Irwin expressly disclaimed its interest in the debt that now belongs to Citimortgage. Since filing that disclaimer, Irwin has taken no part in the litigation. The remaining parties, Sanders and ReCasa, are actively advocating against Citimortgage's interest. No current party is representing Citimortgage's interest.

## C. Citimortgage's Motion to Intervene Was Timely

ReCasa argues that even if Citimortgage satisfies the requirements to intervene of right, we nevertheless should uphold the trial court's denial of Citimortgage's motion on the alternative ground that it was untimely. ReCasa did not raise this issue in the trial court, nor did the court rely upon it in its decision to deny Citimortgage's motion. Nevertheless, as a prevailing party, ReCasa may defend its judgment on any ground.[9] Ind. Trial Rule 59(G). When, as here, we are presented with a new issue on appeal, we will decide the issue so long as there is no dispute as to any material fact. State v. Kokomo Tube Co., 426 N.E.2d 1338, 1348 (Ind. Ct. App. 1981). There is no such dispute, so we proceed to consider whether Citimortgage's motion to intervene was timely.

Timeliness is a discretionary determination that depends entirely upon the facts of the case at hand. Herdrich Petroleum Corp. v. Radford, 773 N.E.2d 319, 325 (Ind. Ct. App. 2002), trans. denied. The requirement that a motion to intervene be "timely" is "intended to insure that the original parties should not be prejudiced by an intervenor's failure to apply sooner, and that the orderly processes of the court are preserved." Id. (quoting Bryant v. Lake Cnty. Trust Co., 166 Ind. App. 92, 101, 334 N.E.2d 730, 735 (Ind. Ct. App. 1975)). It is not intended to "be employed as a tool to sanction would-be intervenors who are tardy in making their application." Id. (quoting Bryant, 166 Ind. App. at 101, 334 N.E.2d at 735). Although post-judgment

---

[9] Counsel for Citimortgage, perhaps believing that ReCasa had waived this argument by not raising it in the trial court, declined to address it on reply.

intervention is generally "disfavored," it is appropriate in certain "extraordinary and unusual circumstances," particularly when "the petitioner's rights cannot otherwise be protected." Bd. of Comm'rs of Benton Cnty. v. Whistler, 455 N.E.2d 1149, 1153–54 (Ind. Ct. App. 1983).

Here, the default judgment was entered on September 16, 2008. Citimortgage filed its motion to intervene thirteen months later, on October 23, 2009. This delay, although considerable, was attributable to ReCasa's failure to provide Citimortgage (or its agent MERS) with notice of the foreclosure suit. It would be both unfair and inconsistent with the purpose of the timeliness requirement to deny Citimortgage's right to intervene under these circumstances. Thus, we find that Citimortgage's motion to intervene was timely.

### The Default Judgment Is Void as to Citimortgage

Citimortgage brought its motion for relief from judgment under Trial Rule 60(B)(6), alleging that the default judgment was void for lack of personal jurisdiction because it had no notice of the foreclosure proceeding. We agree.

### A. Citimortgage's Motion for Relief from Judgment Was Timely

As in its challenge to Citimortgage's motion to intervene, ReCasa alleges that Citimortgage's motion for relief was untimely. Motions for relief under Rule 60(B)(6) "shall be filed within a reasonable time." In the past, we have found such motions timely even when filed nearly two years after the entry of default judgment, where the moving party lacked notice of the proceeding and was thus outside the court's jurisdiction. See, e.g., Shotwell, 572 N.E.2d at 490 (noting that plaintiff failed to make good-faith effort either to serve defendants with process or to meet requirements of relevant service statute). Here, as we have already discussed, Citimortgage filed its motion quite some time—thirteen months—after the entry of default judgment. We find this delay was reasonable, however, because Citimortgage never received notice of the proceeding. Its motion for relief under Rule 60(B)(6), therefore, was timely.

15

**B.  The Trial Court Had No Personal Jurisdiction Over Citimortgage**

Rule 60(B)(6) provides for relief from judgments that are "void."  Shotwell, 572 N.E.2d at 489–90.  A judgment issued without personal jurisdiction is void, and a court has no jurisdiction over a party unless that party receives notice of the proceeding.  Id. at 489.  It is undisputed that Citimortgage never received proper notice of the foreclosure proceeding.  Thus, the trial court never had jurisdiction over Citimortgage, and the default judgment is therefore void as to Citimortgage.

ReCasa argues that its failure to serve process on MERS or Citimortgage should be overlooked because of the letter that its counsel sent on September 23, 2008 to a different attorney representing Citimortgage in Barabas's federal bankruptcy proceeding.  That letter, ReCasa argues, was sufficient to provide Citimortgage with actual knowledge of the foreclosure proceeding.  Under the circumstances, it wasn't.

As a rule, "actual knowledge of the suit does not satisfy due process or give the court in personam jurisdiction."  Overhouser v. Fowler, 549 N.E.2d 71, 73 (Ind. Ct. App. 1990) (quoting Glennar Mercury Lincoln, Inc. v. Riley, 167 Ind. App. 144, 152, 338 N.E.2d 670, 675 (1975)).  "This is, of course, particularly true for service of process and other such notice of initial pleadings."  Abrahamson Chrysler Plymouth v. Ins. Co. of N. Am., 453 N.E.2d 317, 321 (Ind. Ct. App. 1983).  Thus, even if the September 23 letter had provided someone representing Citimortgage in another matter in federal bankruptcy court with actual knowledge of the foreclosure proceeding, it would still have been insufficient to confer jurisdiction upon the trial court to adjudicate Citimortgage's interest in the Madison County property.

**C.  Statutory and Constitutional Claims**

Citimortgage argues that its agent, MERS, enjoys a statutory entitlement to notice under Indiana Code § 32-29-8-1 because it is a "mortgagee."  That is a bridge too far.

16

We have stated that the relationship between Citimortgage and MERS was one of principal and agent. Clearly, one of the primary purposes of that agency relationship was to facilitate efficient service of process. The rapid and piecemeal transfer of mortgages on the secondary market creates a strong presumption that the original lender will quickly transfer its interest in the debt. Hudspeth, supra, at 8. Notice to the lender in such a situation is, as here, ineffective to inform the real party in interest. By designating MERS as an agent for service of process, as Irwin did in the Barabas mortgage, lenders can have their cake and eat it too; they free themselves from burdensome, expensive recording requirements but still receive notice when another lienholder seeks to foreclose on a property in which they have a security interest.

And now we come to the reason that the mortgage describes MERS as both "nominee" and, less convincingly, as "mortgagee." Having created this agency relationship, MERS and its member banks wished to ensure that third parties would respect it. By including the words "as mortgagee" in the description of MERS in the mortgage contract, MERS and Irwin likely sought to bring MERS under the scope of state statutes like Indiana Code § 32-29-8-1: "If a suit is brought to foreclose a mortgage, the mortgagee or an assignee shown on the record to hold an interest in the mortgage shall be named as a defendant."[10] That statute gives a foreclosing party two options as to whom to sue: 1) the mortgagee or 2) an assignee of record. The entire purpose of MERS is to eliminate record assignments, which renders the second option useless. Therefore, in order to be entitled to named defendant status (and thus to notice) under the statute, MERS has to be the "mortgagee," and that is why the mortgage contract so identifies it.

Ultimately, we do not believe that the authors of the original version of this statute, writing in 1877, would have understood the term "mortgagee" to include an entity like MERS

---

[10] This statute was originally enacted in 1877 and has since been subject only to cosmetic amendments. 1877 Ind. Acts ch. 58, § 2 ("And in a suit to foreclose said mortgage, it shall be sufficient to make the mortgagee, or the assignee shown by said record to hold an interest therein, defendants.").

17

that neither holds title to the note nor enjoys a right of repayment. Thus, our decision here should not be taken to mean that MERS is a "mortgagee" as the term is used in Indiana Code § 32-29-8-1. All we hold today is that because Citimortgage never received proper notice of the foreclosure proceeding, it lay beyond the jurisdiction of the trial court, and the default judgment is thus void as to Citimortgage's interest in the Madison County property.

As to ReCasa's arguments regarding the possibility of redemption under Indiana Code § 32-29-8-3, it would be inappropriate to address them here, as we have decided the question before us on other grounds. We therefore express no opinion as to whether Citimortgage had the right to redeem the property under that statute. We emphasize, however, that when we granted transfer in this case, the opinion of the Court of Appeals was vacated in its entirety. Ind. Appellate Rule 58(A).

Similarly, in keeping with our longstanding principle of constitutional avoidance, we decline to address Citimortgage's constitutional claims. Snyder v. King, 958 N.E.2d 764, 768 (Ind. 2011) (citing State v. Darlington, 153 Ind. 1, 4, 53 N.E. 925, 926 (1899) (reiterating rule against deciding constitutional questions that are not "absolutely necessary to a disposition of the cause on its merits.")).

We note in closing that it is both difficult and undesirable to apply such superannuated statutes to the modern mortgage industry.[11] The drafters of the original 1877 version of Indiana Code § 32-29-8-1 envisioned a drama for two, or at most three, actors: Borrower, Mortgagee, and possibly Assignee. They could not have imagined our present-day multi-trillion-dollar

---

[11] Indiana is not alone in this regard; other state courts have noted "the difficulty of attempting to shoehorn a modern innovative instrument of commerce into a nomenclature and legal categories which stem essentially from the medieval English land law." Mortg. Elec. Registration Sys., Inc. v. Revoredo, 955 So.2d 33, 34 (Fla. Ct. App. 2007).

international mortgage market.  The statute that they drafted, and under which Indiana mortgage transactions still take place, thus leaves unaddressed many issues important to contemporary practice.  We recognize that the General Assembly may soon find it necessary to modernize the statutory script to accommodate this new and larger cast of characters.

## Conclusion

On these facts, we hold that the trial court's denial of Citimortgage's motion to intervene and obtain relief from the foreclosure judgment was based on a misinterpretation of the law and thus an abuse of discretion.  We therefore reverse that ruling and remand with instructions to grant the motion to intervene and amend the default judgment to provide that ReCasa took the Madison County property subject to Citimortgage's lien.

Dickson, C.J., Rucker, and David, JJ., concur.