## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Apr 15 2020, 8:56 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Jane H. Ruemmele
Hayes Ruemmele, LLC
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Evan Matthew Comer
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

James S. McKinley,
*Appellant-Defendant,*

v.

State of Indiana,
*Appellee-Plaintiff.*

April 15, 2020

Court of Appeals Case No.
19A-CR-1557

Appeal from the Marion Superior Court

The Honorable Shatrese M. Flowers, Judge

Trial Court Cause No.
49G02-1806-F1-19520

**Bailey, Judge.**

# Case Summary

[1] James S. McKinley ("McKinley") appeals his convictions, following a jury trial, for four counts of child molesting, as Level 1 felonies,[1] and his seventy-year sentence.

[2] We affirm.

# Issues

[3] McKinley raises the following restated issues:

1. Whether the State presented sufficient evidence to support his convictions.

2. Whether the trial court abused its discretion when it sentenced him.

3. Whether his sentence was inappropriate in light of the nature of his offenses.

4. Whether the trial court's exclusion of certain persons from the sentencing hearing violated his constitutional right to a public trial.

---

[1] Ind. Code § 35-42-4-3(a)(1).

# Facts and Procedural History

[4]  A.G., born February 7, 2006, is the daughter of Whitney Mickens ("Mickens") and Antonio Gavia ("Gavia"). A.G. lived with Mickens and had very little contact with Gavia until she was twelve years old. Between May and June of 2018, A.G. began visiting Gavia at the home he shared with his nine-year-old son.

[5]  On Friday, June 8, 2018, Mickens and Gavia planned for A.G. to stay at Gavia's house while Mickens worked that evening. Sometime that day, Gavia contacted Mickens and asked her to pick him up from work. When Mickens arrived, Gavia was with McKinley, whom Mickens had never met before. Both Gavia and McKinley got into Mickens's car, and she drove the two men to pick up their paychecks at a staffing agency and then to a bank to have those checks cashed. Mickens then informed McKinley that she would not be able to drive him anywhere else because she was going to be late for work. McKinley left on foot, and Mickens drove Gavia and A.G. back to Gavia's apartment.

[6]  A.G. ended up spending that entire weekend at Gavia's apartment, with Mickens's consent. When Mickens picked A.G. up from Gavia's home in the late evening of Sunday, June 10, A.G. appeared "tired" and "groggy." Tr. Vol. II at 131. At approximately midnight that night, Gavia called Mickens and asked her to bring A.G. back to his apartment because he "want[ed] to spend more time with her." *Id.* at 132. Mickens refused. The following afternoon, Gavia contacted Mickens and asked her to meet him at a "cash-checking place"

close to his home so that he could give her some money for A.G. *Id*. Mickens thought it was odd that Gavia would offer to give A.G. cash because he had never supported A.G. financially in the past. When Mickens and A.G. arrived at the agreed-upon location, Gavia was there along with McKinley and two other women who Mickens did not know.

[7] Mickens had an "uneasy" feeling about A.G.'s weekend visit with Gavia. *Id*. at 134. Therefore, before A.G. left for school on the morning of Wednesday, June 13, Mickens asked A.G. if there "was anything going on at her father's house" that she "needed to know about." *Id*. At first, A.G. denied that anything had happened over the weekend, but when Mickens asked a second time, A.G. disclosed that she had been sexually assaulted by her father. Mickens took A.G. to school and instructed her to inform her "auntie" Taruko Knight-Galvia ("Galvia")—a school administrative assistant with whom A.G. and Mickens had become close—about what had happened over the weekend. *Id*. at 144. Mickens then called 9-1-1 to report the abuse but was told that A.G. needed to be with her for them to investigate.

[8] At school that morning, A.G. reported her father's sexual abuse to school staff, including Galvia. The school called the police and the Indiana Department of Child Services ("DCS"). DCS workers came to the school and took custody of A.G. A.G. was transported to the Child Advocacy Center in Indianapolis where she gave a forensic interview. During the interview, A.G. disclosed that she had been the victim of molestation and neglect and named both Gavia and

McKinley, whom she identified by his first name "James," as the perpetrators. *Id.* at 181. She provided a physical description of both Gavia and McKinley.

[9] Detective Jonathan Schultz ("Det. Schultz") with the Indianapolis Metropolitan Police Department ("IMDP") observed A.G.'s forensic interview from a remote room. Following the interview, Det. Schulz spoke to Mickens and then travelled to the staffing agency where McKinley and Gavia worked in order to obtain information about the two men. Once Det. Schulz learned McKinley's identity, he compiled a six-pack photo array for A.G. to view. When presented with the photo array, A.G. positively identified McKinley as the person who molested her.

[10] That same day, i.e., June 13, the IMPD executed a search warrant on Gavia's apartment. The officers collected two towels that, under a UV light, indicated the presence of possible biological fluids. In one of the bedrooms on the second floor of the residence, they also found a mattress pad that had been placed downside up. When the mattress was flipped over, the officers discovered possible staining from biological fluid. Crime scene technicians cut three clippings from the mattress and collected them as evidence. Laboratory testing later revealed the presence of seminal material on the mattress clippings, and subsequent DNA testing confirmed that in each of the three mattress clippings the sperm cell DNA matched McKinley's DNA profile.

[11] The following day, Det. Schulz contacted McKinley, and he agreed to meet for an interview at the Child Advocacy Center. Prior to the start of the interview,

McKinley signed a written advisement of rights form provided by Det. Schulz. Initially, McKinley admitted that he had been present at Gavia's apartment the previous weekend, but he denied any sexual contact with AG. As he was questioned, McKinley eventually agreed that "this is the one time and only time" that anything like what had happened the previous Sunday would occur. Ex. at 48, State's Ex. 58 at 1:00:20-1:00:40. When Det. Schulz asked if anything similar would "ever happen again," McKinley said, "No." *Id.* at 1:01:45-1:01:58. Det. Schulz then asked McKinley if he was "sorry for what happened," and McKinley nodded his head. *Id.* at 1:01:49-1:02:08. McKinley later stated, "I didn't force her, no, she was begging me on." *Id.* at 1:13:09-1:13:13. And when Schulz asked him one final time whether he had engaged in sex with A.G., McKinley nodded and responded, "Basically." *Id.* at 1:13:14-1:13:23.

[12] On June 18, 2018, the State charged McKinley with four counts of child molesting, as Level 1 felonies, and one count of intimidation, as a Level 6 felony.[2] McKinley had a jury trial on June 10-11, 2019. At trial, A.G. testified that, sometime on Sunday, June 10, 2018, Gavia approached her after she had just finished showering and instructed her to lie down naked on a nearby bed. Gavia walked up to A.G. as she lay on the bed and licked her vagina. He then went out into the hallway and started arguing with a man A.G. recognized to be McKinley. They were arguing "about what [McKinley] should do to [her]."

---

[2] I.C. § 35-45-2-1(a)(1), (b)(1)(A).

Tr. Vol. II at 141-42. Eventually, McKinley entered the room and asked A.G. how old she was. A.G. responded that she was twelve. McKinley told her that he "wasn't going to do it" and left the room. *Id*. at 142.

[13] Out in the hallway, McKinley and Gavia began arguing again. McKinley then returned to the room and instructed A.G. to "suck" on his penis. *Id*. A.G. did so, and afterwards, McKinley inserted his penis into her vagina. The penetration "hurt, a lot," and A.G. told McKinley that she "didn't want to do it." *Id*. Once McKinley stopped, A.G. put on some clothes and McKinley left the bedroom. A.G. then overheard Gavia tell McKinley "you could do it" and that McKinley "could go back up there and do whatever you want with her." *Id*. McKinley then went back to A.G. in the bedroom, removed A.G.'s clothes, and forced her to perform oral sex on him a second time. He then inserted his penis into A.G.'s vagina and forced her to engage in vaginal sex. When McKinley finished, he removed his penis from A.G.'s vagina and ejaculated on her. A.G. then used a towel to clean the "white stuff" off her body. *Id*. at 143. Both Gavia and McKinley threatened harm to A.G.'s family if she told anyone what had happened.

[14] A.G. also testified that, after she told Mickens what Gavia had done to her, Mickens immediately began trying to contact Gavia and told A.G. to go to school and report it. Therefore, at that time A.G. did not have the opportunity to tell Mickens what McKinley had done to her. A.G. testified that, at first, she also did not tell the school about what McKinley had done because McKinley had threatened her if she told anyone.

[15] On June 11, 2019, the jury found McKinley guilty of four counts of Level 1 felony child molesting and not guilty on one count of Level 6 felony intimidation. Shortly after the jury announced its verdict, Lisa Yednak ("Yednak"), who is the mother of McKinley's six children, began shouting "You just took my kids [sic] daddy away. You just took my kids [sic] daddy away." Tr. Vol. III at 75. An outburst involving several members of McKinley's family then ensued, which resulted in the family members' removal from the courtroom and direct contempt proceedings against Yednak.

[16] During the contempt hearing, the trial judge appointed McKinley's attorney to represent Yednak. The trial court recounted that Yednak "yelled something" which caused a "may-lay"—melee—to begin. Supp. Tr. at 3. During the tumult, McKinley "threw down his headset" and "[g]ot out of his seat and walked over and was in front of the bench." *Id.* That was where McKinley was detained by security personnel. Ultimately, the court found Yednak not to be in contempt of court but barred her and several other family members from returning to the courtroom for McKinley's sentencing hearing. The trial court later clarified that its exclusion order extended to all of McKinley's family members except for an "older female," who was the only person in McKinley's family who "did not have an outburst." Tr. Vol. III at 80. The court granted McKinley's subsequent request to permit a single family representative to attend his sentencing hearing.

[17] McKinley's sentencing hearing was held on June 25. The trial court noted that a family representative was present in the courtroom in support of McKinley

and that the court had reviewed a number of letters that had been submitted to the court by McKinley's family members. After hearing argument from the State and from McKinley, the trial court issued both oral and written sentencing statements in which it found, as the sole mitigating factor, that a prolonged period of incarceration would impose an "undue hardship on the defendant's six children." *Id.* at 92; Appealed Order at 2. The court found three aggravating factors: (1) McKinley's criminal history, (2) the nature and circumstances of the offenses in that they were "two separate instances," and (3) the harm suffered by the victim was greater than the elements necessary to prove the offenses. *Id.* The court sentenced McKinley to thirty-five years for each count of child molesting with two counts to run consecutive to one another, for an aggregated sentence of seventy years. This appeal ensued.

# Discussion and Decision

## Sufficiency of the Evidence

[18] McKinley challenges the sufficiency of the evidence to support his convictions. Our standard of review of the sufficiency of the evidence is well-settled.

> When an appellate court reviews the sufficiency of the evidence needed to support a criminal conviction, it neither reweighs evidence nor judges the credibility of witnesses. *Bailey v. State*, 907 N.E.2d 1003, 1005 (Ind. 2009). The appellate court only considers "the evidence supporting the judgment and any reasonable inferences that can be drawn from such evidence." *Id.* (quoting *Henley v. State*, 881 N.E.2d 639, 652 (Ind. 2008)). A conviction will be affirmed if there is substantial evidence of

probative value supporting each element of the offense such that a reasonable trier of fact could have found the defendant guilty beyond a reasonable doubt. *Bailey*, 907 N.E.2d at 1005. A verdict of guilt may be based upon an inference if reasonably drawn from the evidence. *See Drane v. State*, 867 N.E.2d 144, 147 (Ind. 2007).

*Tin Thang v. State*, 10 N.E.3d 1256, 1258 (Ind. 2014). Moreover, a conviction may be sustained on only the uncorroborated testimony of a single witness, even when that witness is the victim. *Bailey v. State*, 979 N.E.2d 133, 135 (Ind. 2012).

[19] To support McKinley's convictions of child molesting, as Level 1 felonies, the State was required to prove for each count that McKinley, who was at least twenty-one years old, performed or submitted to sexual intercourse or other sexual conduct with a child under age fourteen. I.C. § 35-42-4-3(a)(1). "Other sexual conduct" includes an act involving "a sex organ of one (1) person and the mouth or anus of another person." I.C. § 35-31.5-2-221.5. McKinley's only allegation regarding the sufficiency issue is that there was not sufficient evidence to show that he was the person who performed or submitted to sexual intercourse or other sexual conduct with A.G.

[20] At the trial, A.G. positively identified McKinley and described in detail his molestation of her at her father's apartment on June 10, 2018. She testified that McKinley performed or submitted to four specific sex acts on or with her at two distinct points over the course of a single evening. That evidence, alone, was sufficient to support McKinley's four convictions. *Bailey*, 979 N.E.2d at 135.

However, the State also provided evidence that McKinley's DNA was found on the mattress at the scene of the crime. In addition, the State provided a video tape of the police interview of McKinley on June 14, 2018, in which McKinley was asked, "You guys [referring to him and A.G.] had sex, right?" and McKinley nodded as he responded, "Basically." Ex. at 48, State's Ex. 58 at 1:13:14-1:13:23.

[21] McKinley maintains that the evidence was not sufficient because there were some inconsistencies in A.G.'s description of him and his DNA was not found on A.G. at her forensic examination—which took place three days after the crime—or on a towel that A.G. said she had used to wipe off McKinley's semen. However, McKinley's contentions are requests that we reweigh the evidence, which we may not do. *Tin Thang*, 10 N.E.3d at 1258. Rather, it is the jury's exclusive province to weigh conflicting evidence. *Smith v. State*, 34 N.E.3d 1211, 1222 (Ind. 2015); *see also Brooks v. State*, 560 N.E.2d 49, 53 (Ind. 1990) (citation omitted) ("The circumstances under which B.B. viewed his attacker and the discrepancies between his description, the composite, and appellant's appearance were fully disclosed to the jury, and it was for them to determine the weight given to the identification evidence and to decide whether it was satisfactory or trustworthy.").

[22] The State presented sufficient evidence to support McKinley's convictions.

# Abuse of Discretion in Sentencing

[23]     McKinley maintains that the trial court erred in sentencing him. Sentencing decisions lie within the sound discretion of the trial court. *Cardwell v. State*, 895 N.E.2d 1219, 1222 (Ind. 2008). An abuse of discretion occurs if the decision is "clearly against the logic and effect of the facts and circumstances before the court, or the reasonable, probable, and actual deductions to be drawn therefrom." *Gross v. State*, 22 N.E.3d 863, 869 (Ind. Ct. App. 2014) (citation omitted), *trans. denied*. A trial court abuses its discretion in sentencing if it does any of the following:

> (1) fails "to enter a sentencing statement at all;" (2) enters "a sentencing statement that explains reasons for imposing a sentence—including a finding of aggravating and mitigating factors if any[ ]—but the record does not support the reasons;" (3) enters a sentencing statement that "omits reasons that are clearly supported by the record and advanced for consideration;" or (4) considers reasons that "are improper as a matter of law."

*Id.* (quoting *Anglemyer v. State*, 868 N.E.2d 482, 490-491 (Ind. 2007), *clarified on reh'g*, 875 N.E.2d 218 (Ind. 2007)). So long as a sentence is within the statutory range, the trial court may impose it without regard to the existence of aggravating or mitigating factors. *Anglemyer*, 868 N.E.2d at 489. However, if the trial court does find the existence of aggravating or mitigating factors, it must give a statement of its reasons for selecting the sentence it imposes. *Id.* at 490. But the relative weight or value assignable to reasons properly found, or

those which should have been found, is not subject to review for abuse of discretion.  *Gross*, 22 N.E.3d at 869.

[24]  The sentencing range for a Level 1 felony committed after June 30, 2014, is a fixed term of imprisonment between twenty and forty years, with an advisory sentence of thirty years.  I.C. § 35-50-2-4(b).  The trial court sentenced McKinley to thirty-five years per conviction, which was five years below the maximum for each count.  Moreover, the court ordered two of those sentences to run consecutive to one another.  Thus, the challenged aggregate sentence imposed—i.e., seventy years—was not the maximum possible aggregate sentence for four Level 1 felony convictions; rather, it was ninety years below the maximum sentence he could have received.  *Id.*

[25]  Nevertheless, McKinley contends the trial court abused its discretion by considering "improper" aggravators in the decision to impose the thirty-five-year sentences and to require two of the sentences to run consecutively.  Appellant's Br. at 20.  Specifically, he asserts that the trial court improperly found his prior felony firearms convictions involved violence and improperly relied on the arrests in his criminal history.  However, even if we assume for the sake of argument that the trial court considered those factors and that they were improper, any such error was harmless as we can confidently say the trial court would have properly entered those same sentences based solely upon the valid aggravating factor of McKinley's undisputed criminal history of two non-violent felony convictions and two misdemeanor convictions.  *See Anglemyer v. State*, 868 N.E.2d 482, 491 (Ind. 2007).  *See also Gleason v. State*, 965 N.E.2d

702, 712 (Ind. Ct. App. 2012) (citation omitted) ("One valid aggravator alone is enough to enhance a sentence or to impose it consecutive to another. Moreover, the same factor may be used both to enhance a presumptive sentence and to justify consecutive sentences."); Ind. Code § 35-38-1-7.1(a)(2) (stating criminal history is an aggravating circumstance a court may consider in sentencing). We will not reweigh the mitigating and aggravating circumstances, as McKinley requests. *Gross*, 22 N.E.3d at 869.

## Inappropriateness of Sentence

[26]  McKinley contends that his sentence is inappropriate in light of the nature of the offense.[3] Article 7, Sections 4 and 6, of the Indiana Constitution authorize independent appellate review and revision of a sentence imposed by the trial court. *See, e.g.*, *Sanders v. State*, 71 N.E.3d 839, 843 (Ind. Ct. App. 2017), *trans. denied*. This appellate authority is implemented through Indiana Appellate Rule 7(B). *Id*. Revision of a sentence under Rule 7(B) requires the appellant to demonstrate that his sentence is inappropriate in light of the nature of his offense and his character. *Id*. (citing Ind. Appellate Rule 7(B)). We assess the trial court's recognition or non-recognition of aggravators and mitigators as an initial guide to determining whether the sentence imposed was inappropriate. *Robinson v. State*, 61 N.E.3d 1226, 1228 (Ind. Ct. App. 2016).

---

[3] McKinley makes no argument that the sentence is inappropriate in light of his character; therefore, he has waived any such argument. Ind. Appellate Rule 46(A).

[27] Indiana's flexible sentencing scheme allows trial courts to tailor an appropriate sentence to the circumstances presented, and the trial court's judgment "should receive considerable deference." *Cardwell v. State*, 895 N.E.2d 1219, 1222 (Ind. 2008). The principal role of appellate review is to attempt to "leaven the outliers." *Id*. at 1225. Whether we regard a sentence as inappropriate at the end of the day turns on "our sense of the culpability of the defendant, the severity of the crime, the damage done to others, and myriad other facts that come to light in a given case." *Id*. at 1224. The question is not whether another sentence is more appropriate, but rather whether the sentence imposed is inappropriate. *King v. State*, 894 N.E.2d 265, 268 (Ind. Ct. App. 2008). Deference to the trial court "prevail[s] unless overcome by compelling evidence portraying in a positive light the nature of the offense (such as accompanied by restraint, regard, and lack of brutality) and the defendant's character (such as substantial virtuous traits or persistent examples of good character)." *Stephenson v. State*, 29 N.E.3d 111, 122 (Ind. 2015).

[28] McKinley contends that the nature of the offense does not support his thirty-five-year sentences for each count of child molesting. First, we emphasize again that thirty-five years is within the twenty-to-forty-year sentencing range for a Level 1 felony and is only five years above the advisory sentence of thirty years. I.C. § 35-50-2-4(b). Moreover, the trial court ordered two of the sentences to run concurrently, thereby reducing his actual time of incarceration by half. Second, when considering the nature of the offense, we look at the defendant's actions in comparison to the elements of the offense. *Cannon v.*

*State*, 99 N.E.3d 274, 280 (Ind. Ct. App. 2018), *trans. denied*. Child molestation is among the most severe and heinous of offenses and, here, the crime was made worse by the fact that McKinley repeatedly forced a young girl to submit to sex acts with him despite specifically asking her her age and being informed that she was only twelve-years-old and being encouraged to sexually exploit her by her own father, who McKinley knew had also sexually assaulted A.G. McKinley showed no "restraint" in the commission of his crimes. *Stephenson*, 29 N.E.3d at 122. In short, there is nothing about the nature of the offense that merits a reduction of McKinley's sentence.

# Right to Public Trial

[29] McKinley asserts that the trial court denied his constitutional[4] right to a public trial when it barred most of his family from attending his sentencing hearing. However, he raises this contention for the first time on appeal. It is the general rule that an argument or issue raised for the first time on appeal is waived for appellate review. *See, e.g.*, *Plank v. Cmty. Hosp. of Ind., Inc.*, 981 N.E.2d 49, 53 (Ind. 2013) ("[A]ppellate review presupposes that a litigant's arguments have been raised and considered in the trial court."); *Carney v. Patino*, 114 N.E.3d 20, 29 n.6 (Ind. Ct. App. 2018) ("The trial court cannot be found to have erred as to an issue or argument that it never truly had an opportunity to consider."), *trans.*

---

[4] McKinley raises this issue under both the Sixth Amendment to the United States Constitution and Article 1, Section 13 of the Indiana Constitution. However, neither he nor our Supreme Court has suggested that the Indiana Constitution establishes a right different from that found in the Sixth Amendment. *See Williams v. State,* 690 N.E.2d 162, 167 (Ind.1997).

*denied*. Our Supreme Court has signaled a shift away from this rule as it relates to appellees. *Citimortgage v. Barabas*, 975 N.E.2d 805, 813 (Ind. 2012) (holding that a party who has prevailed at the trial court "may defend the trial court's ruling on any grounds, including grounds not raised at trial"). However, an *appellant* still "may not present an argument that was not presented to the trial court." *Ind. Bureau of Motor Vehicles v. Gunter*, 27 N.E.3d 306, 312 (Ind. Ct. App. 2015); *see also Reynolds v. Reynolds*, 64 N.E.3d 829, 834 (Ind. 2016) ("Appellants may not sit idly by and raise issues for the first time on appeal."). Thus, McKinley has waived a claim regarding his right to a public trial.

[30] Waiver notwithstanding, we discern no violation of McKinley's constitutional right to a public trial. In *Williams v. State*, our Supreme Court addressed the right to a public hearing under both the federal and state constitutions:

> The right to a public trial has long been recognized as a fundamental right of the accused. [*In re*] *Oliver*, 333 U.S. [257,] 266-67; *Hackett v. State*, 266 Ind. [103,] 109, 360 N.E.2d [1000,] 1004 [(1977)]. It helps ensure a fair trial because "the presence of interested spectators may keep [the accused's] triers keenly alive to a sense of their responsibility and to the importance of their functions...." *Waller* [*v. Georgia*], 467 U.S. [39,] 46 [(1984)]. It protects the accused by allowing the public to assess the fairness of the proceedings. In addition, it encourages witnesses to come forward, and discourages perjury. *Waller*, 467 U.S. at 46. In addition to the rights of the defendant, the public trial implicates the First Amendment right of the press and public to attend a criminal trial or other proceeding. However, neither right is absolute. Complete or partial exclusion of the public may be justified if a court finds "that closure is essential to preserve higher values and is narrowly tailored to serve that interest. The

> interest is to be articulated along with findings specific enough
> that a reviewing court can determine whether the closure order
> was properly entered." *Waller*, 467 U.S. at 45.

690 N.E.2d 162, 166-67 (Ind. 1997) (some citations omitted); *see also Long v. State*, 121 N.E.3d 1085, 1088 (Ind. Ct. App. 2019) (citing *Marcum v. State*, 725 N.E.2d 852 (Ind. 2000)) (noting a trial court is given latitude to manage the courtroom and maintain order and decorum), *trans. denied*. Thus, "limited restrictions on the right to a public trial are within the trial court's discretion where they are related to a legitimate purpose furthering the integrity of the judicial process, so long as there is a sufficient record supporting the judge's exercise of that discretion." *Hackett*, 360 N.E.2d at 1004.

[31] Here, the trial court excluded members of McKinley's family from attending his sentencing hearing only after they caused a "melee" at the end of his jury trial. Supp. Tr. at 3. All except one of his family members disrupted the proceedings, requiring their removal from the court room and direct contempt proceedings against Yednak. Although the court ultimately decided not to hold Yednak in contempt, it barred her and all family members except one "older female" who "did not have an outburst" from subsequent proceedings, which included the sentencing hearing. Tr. Vol. III at 80. Thus, the court narrowly tailored its exclusion exclusively to those who had caused a disruption. And, upon McKinley's request, the court allowed one representative family member to attend the sentencing hearing. The trial court specifically articulated its reasons for the exclusion of most family members, the exclusion was no broader than

necessary, and it was justified by the need to maintain order in the proceedings. The trial court did not violate McKinley's right to a public hearing or abuse its discretion in excluding some of McKinley's family members from attending his sentencing hearing.

# Conclusion

[32] The State presented sufficient evidence to support McKinley's four Level 1 felony convictions of child molesting, and the trial court did not abuse its discretion when it sentenced him to an aggregate term of seventy years for those convictions. McKinley's sentence is not inappropriate given the nature of his offenses. The trial court was justified in excluding some members of McKinley's family from his sentencing hearing.

[33] Affirmed.

Crone, J., and Altice, J., concur.