ATTORNEY FOR APPELLANT
Jon L. Orlosky
Muncie, Indiana

ATTORNEYS FOR AMICUS
CURIAE THE STATE OF INDIANA
Gregory F. Zoeller
Attorney General of Indiana

Thomas M. Fisher
Solicitor General of Indiana

Heather H. McVeigh
Tamara L. Weaver
Deputy Attorneys General
Indianapolis, Indiana

ATTORNEY FOR AMICUS CURIAE
ASSOCIATION OF INDIANA
COUNTIES
Andrew Berger
Indianapolis, Indiana

ATTORNEYS FOR AMICUS
CURIAE SRI, INCORPORATED
Matthew T. Albaugh
Brent A. Auberry
Benjamin A. Blair
Indianapolis, Indiana

ATTORNEY FOR AMICUS CURIAE
INDIANA COUNTY AUDITORS'
ASSOCIATION, INC.
Michelle L. Baldwin
Fishers, Indiana

ATTORNEYS FOR APPELLEES
Robert Delano Jones
E. Paige Freitag
Bloomington, Indiana

ATTORNEYS FOR AMICUS
CURIAE INDIANA BANKERS
ASSOCIATION
Thomas W. Dinwiddie
Maureen E. Ward
Indianapolis, Indiana



FILED
Sep 26 2013, 9:37 am

CLERK
of the supreme court,
court of appeals and
tax court

# In the
# Indiana Supreme Court

No. 03S04-1211-CC-645

M & M INVESTMENT GROUP, LLC,

*Appellant (Petitioner below),*

v.

AHLEMEYER FARMS, INC. AND MONROE
BANK,

*Appellees (Respondents below).*

Appeal from the Bartholomew Circuit Court, No. 03C01-1109-CC-5167
The Honorable Stephen R. Heimann, Judge

On Petition to Transfer from the Indiana Court of Appeals, No. 03A04-1112-CC-639

**September 26, 2013**

**David, Justice.**

Before a parcel of real property can be sold at a tax sale, the Indiana Code requires the county auditor to mail notice of the pending sale to any mortgagee holding a mortgage on the property—provided, however, that the mortgagee has first affirmatively requested such notice by submitting a form to the auditor. Is such a procedure permissible under the Due Process Clause of the Fourteenth Amendment? The answer, we said over two decades ago, is "Yes."

But in this case a bank failed to submit the required form to the Bartholomew County auditor and therefore was not notified that one of its mortgaged properties was tax-delinquent until after the property had been sold and the buyer requested a tax deed. The bank objected, challenging the constitutionality of this statutory scheme in light of a more recent case from the U.S. Supreme Court. The trial court below agreed with the bank and refused to issue the tax deed, but we remain firm that the answer to the constitutional question is still "Yes," and therefore reverse.

## Facts and Procedural History

The essential facts of this case are not in dispute. In September 2010, M & M Investment Group, LLC purchased a parcel of real property in Bartholomew County at a tax sale. The prior owner of the property was Ahlemeyer Farms, Inc. At the time of the sale, Monroe Bank was a mortgagee with respect to the property, holding two mortgages properly recorded in Bartholomew County.

Indiana's statutory scheme for tax sales of real property requires the auditor of the county in which the sale is conducted to send notice of the sale, by certified mail, to any mortgagee who annually requests such notice. Ind. Code § 6-1.1-24-3 (2010). Monroe Bank did not fulfill this requirement. Therefore it did not receive pre-sale notice of the property becoming available at a tax sale. In accordance with the Indiana Code, though, M & M timely notified Monroe Bank of

2

the executed sale and its intent to seek a tax deed for the property.  See Ind. Code §§ 6-1.1-25-4.5, -4.6 (2010).

M & M filed a petition to direct the Bartholomew County auditor to issue a tax deed for the property and Monroe Bank filed a response challenging the tax sale notice statutes as unconstitutional under the Fourteenth Amendment to the U.S. Constitution.  The trial court did not certify the challenge to the constitutionality of a state statute to the Attorney General of Indiana, but issued an order holding that Indiana Code § 6-1.1-24-3(b) was unconstitutional and denying M & M's petition.

M & M appealed, arguing that the trial court's failure to certify the constitutional challenge to the Attorney General was reversible error, and also that the pre-tax notice requirement is constitutional.  The State filed a brief as amicus curiae, asserting its interest in the case and likewise arguing that the notice statute satisfies the requirements of the Due Process Clause of the Fourteenth Amendment.[1]  The Court of Appeals affirmed.[2]  M & M Investment Group, LLC v. Ahlemeyer Farms, Inc., 972 N.E.2d 889 (Ind. Ct. App. 2012).

---

[1] The State also filed an amicus brief in support of M & M's petition to transfer, as did a number of other groups like the Association of Indiana Counties, SRI Incorporated, and the Indiana County Auditors' Association, Inc.  Additionally, the Indiana Bankers Association filed a brief with this Court in support of Monroe Bank.  We thank them for their collective input and analysis on this matter.

[2] A step in this case's appellate process that was neither necessary nor proper under our Appellate Rules as this Court has "mandatory and exclusive jurisdiction" over "Appeals of Final Judgments declaring a state or federal statute unconstitutional in whole or in part."  Ind. Appellate Rule 4(A)(1)(b); see also Ind. Appellate Rule 6.

We granted transfer, <u>M & M Investment Group, LLC v. Ahlemeyer Farms, Inc.</u>, 978 N.E.2d 752 (Ind. 2012) (table),[3] thereby vacating the Court of Appeals opinion, Ind. Appellate Rule 58(A).

**Standard of Review**

A party challenging a statute as unconstitutional must clearly overcome a presumption of constitutionality by a contrary showing. <u>Sims v. U.S. Fidelity & Guar. Co.</u>, 782 N.E.2d 345, 349 (Ind. 2003). All doubts are resolved in favor of constitutionality and against the challenging party. <u>Boehm v. Town of St. John</u>, 675 N.E.2d 318, 321 (Ind. 1996). We presume that the General Assembly did not intentionally violate the constitution and will not interpret a statute otherwise unless that interpretation is required by the unambiguous language of the statute. <u>Id.</u> Therefore, when a trial court has found a statute unconstitutional our standard of review gives even less deference than de novo review. <u>Horseman v. Keller</u>, 841 N.E.2d 164, 170 (Ind. 2006). If there are any grounds for reversal we will do so. <u>Id.</u>

**Discussion**

M & M's first issue on appeal is that the trial court failed to certify Monroe Bank's constitutional challenge, and this failure mandates reversal. In short summary, M & M is correct that the Indiana Code requires trial courts to certify constitutional challenges to state statutes to the Attorney General. Ind. Code § 34-33.1-1-1(a) (Supp. 2012). It was error for the trial court

---

[3] Ahlemeyer Farms is not seeking relief, nor did they file a brief with this Court. However, as a party to the tax deed petition they remain the captioned party on appeal even though Monroe Bank is the party asserting the constitutional challenge. <u>See</u> Ind. Appellate Rule 17(A).

not to do so here, and that error prevented the State from intervening and presenting its arguments as to the constitutionality of the tax sale statute. The State, however, has since asserted its interests by way of a well-written amicus brief and we see no need to remand (nor does the State request it) in order that we take longer to get to the same place as we are now. The constitutional challenge is a question of law that this Court can resolve without further proceedings before the trial court.

The crux of this case, rather, is the trial court's finding that the Indiana Code provisions governing pre-sale notice "do not provide constitutionally protected due process to Monroe Bank as mortgagee." (Appellant's Br. at 12.) It appears to have based this conclusion on an interpretation of a 1983 U.S. Supreme Court case, Mennonite Bd. of Missions v. Adams, 462 U.S. 791 (1983), which the trial court said "held that notification of a mortgagee by publication is insufficient notice." (Appellant's Br. at 12.) Before we delve into whether that proposition is correct, some background is in order.

## I. Indiana's Tax Sale Statutes

Indiana's tax sale statutes have long required the county auditor to post notice in the county courthouse and publish notice in a newspaper of the properties being brought up for a tax sale. See, e.g., Ind. Code § 64-2202 (1951). And for over fifty years, the auditor has also been required to provide the owner of the property with notice by mail to the owner's last known address. Ind. Code § 64-2202 (1961). Prior to a 1980 amendment, however, the statutes did not require the auditor to provide any form of pre-sale notice by mail or service to the mortgagee of one of those properties.

Purchase of a property at a tax sale does not automatically entitle the purchaser to possession. Instead the auditor would issue the purchaser a certificate of sale, whereupon "the purchaser acquires a lien against the real property for the entire amount paid. The lien of the purchaser is superior to all liens against the real property which exist at the time the certificate is

5

issued." Ind. Code § 6-1.1-24-9(b) (2010). To obtain the deed to the property, the purchaser must then follow the procedures allowing for redemption by an owner or mortgagee, and then seek to quiet title. See generally Ind. Code 6-1.1-25.

In broad strokes, this was the statutory scheme the U.S. Supreme Court faced in Mennonite, 462 U.S. at 792–94,[4] in which a property owner failed to pay property taxes and the property—located in Indiana and subject to a validly recorded mortgage—was sold at a tax sale. In accordance with the existing tax sale statutes, notice of the sale was posted in the county courthouse, published in a newspaper, and mailed to the property owner. Neither the owner nor the mortgagee appeared or responded to the notices. The mortgagee did not learn the property had been sold until the expiration of the redemption period, when the purchaser sought to quiet title.

The mortgagee argued that it had not received constitutionally adequate notice of the pending sale or opportunity to redeem and the U.S. Supreme Court agreed, concluding that "the manner of notice provided to [the mortgagee] did not meet the requirements of the Due Process Clause of the Fourteenth Amendment." Id. at 800. It specifically noted that publication and posting in the courthouse are designed to attract *buyers* to a tax sale, not the property owners or mortgagees. Id. at 799. Owners and mortgagees have an interest in the property but "do not make special efforts to keep abreast of such notices." Id.

It therefore found those forms of notice unreasonable when "an inexpensive and efficient mechanism such as mail service is available." Id. (quoting Greene v. Lindsey, 456 U.S. 444, 455 (1982)). "Notice by mail or other means as certain to ensure actual notice is a minimum

---

[4] Though Mennonite was decided in 1983, the relevant events took place prior to the 1980 amendment to the tax sale statutes. See Mennonite, 462 U.S. at 793 n.2. The Court therefore did not consider the constitutionality of the statute as amended, the substance of which we discuss below.

constitutional precondition to a proceeding which will adversely affect the liberty or property interests of any party" when "its name and address are reasonably ascertainable." Id. Consequently, the Court held that when a mortgagee is identified in a publicly recorded mortgage, notice by publication "must be supplemented by notice mailed to the mortgagee's last known available address, or by personal service." Id. at 798. Constructive notice alone was only sufficient when the mortgagee was not reasonably identifiable. Id.

In 1980, the General Assembly amended the tax sale statutes to additionally require notice by certified mail to the mortgagee of any real property being put forth for tax sale. Ind. Code § 6-1.1-24-4.2 (1982); Act of February 28, 1980, P.L. 45-1980, § 1, 1980 Ind. Acts 534. However, the mortgagee had to first annually request such notice by way of a form and agree to pay a fee to cover the mailing costs, not to exceed ten dollars. Id.

In 1986, the statute was amended again to require the auditor to send pre-sale notice to all mortgagees and "other persons having a substantial property interest of public record that would be affected by the sale of real property under this chapter." Ind. Code § 6-1.1-24-4.2 (1989); Act of March 11, 1986, P.L. 60-1986, § 4, 1986 Ind. Acts 888. No request by the mortgagee or interest-holder was first required. Id.

Then in 1989 the legislature changed the statutory scheme again. Indiana Code § 6-1.1-24-4.2 was repealed entirely and Indiana Code § 6-1.1-24-3 was amended to include a new subsection (b), requiring the county auditor, in addition to notice by publication and posting, to mail notice by certified mail "to any mortgagee who annually requests a copy of the notice." Ind. Code § 6-1.1-24-3(b); Act of May 5, 1989, P.L. 83-1989, §§ 5, 18, 1989 Ind. Acts 930, 941 (section 5 amended Ind. Code § 6-1.1-24-3 and section 18 repealed Ind. Code § 6-1.1-24-4.2). It also added a new clause providing that "the failure of the county auditor to mail this notice or its

nondelivery does not affect the validity of the judgment and order." Id. This remains the form of the statute today.[5]

And this was the statutory structure before this Court in 1992 when we decided a trio of cases addressing constitutional questions related to the tax sale statutes as they had been amended over the preceding decade. Elizondo v. Read, 588 N.E.2d 501 (Ind. 1992); see also Griffin v. Munco Assoc., 589 N.E.2d 220 (Ind. 1992); Miller Reeder Co. v. Farmers State Bank of Wyatt, 588 N.E.2d 506 (Ind. 1992). And as this structure remains (in relevant part) largely the same, a review of those cases completes the background of these statutes and thus informs—if not compels—our result today.

In the primary of the three cases, Elizondo, the Elizondos executed a mortgage on a piece of recreational property in 1979. From 1981 to 1984, all property tax statements were sent to one address. Unbeknownst to the county auditor's office, however, the Elizondos moved twice within that same period of time. The Elizondos never updated their address with the auditor's office, although the auditor also had other records on file showing the second of the Elizondos' three addresses. Additionally, the third of their addresses (the correct one) was reflected in the phone book.

All the notices sent to the first address were returned marked either "Unclaimed" or "Undeliverable as addressed. No forwarding order on file." The Elizondos did not pay the taxes due on the property and it became eligible for a tax sale.

---

[5] In full, Indiana Code § 6-1.1-24-3(b) now provides:

> At least twenty-one (21) days before the application for judgment is made, the county auditor shall mail a copy of the notice required by sections 2 and 2.2 of this chapter by certified mail, return receipt requested, to any mortgagee who annually requests, by certified mail, a copy of the notice. However, the failure of the county auditor to mail this notice or its nondelivery does not affect the validity of the judgment and order.

In 1984, the auditor's office sent the Elizondos a courtesy letter and then a certified letter containing the formal notice of the tax sale. The mortgagee on the property had not completed the statutory request form and thus no pre-sale notice was sent to the mortgagee at all. The letter to the Elizondos also came back marked "Unclaimed," and pursuant to the statutory scheme at the time, the auditor published a notice of tax sale in several local newspapers. The property was purchased at the tax sale by a third party and at the end of the redemption period a "notice of redemption or issuance of tax deed" was sent to the first address. This came back marked "Undeliverable as addressed. No forwarding order on file." The purchasers received a tax deed.

The Elizondos sued, and this Court confronted the dual questions of whether the statutory scheme provided constitutionally sufficient notice to the mortgagee and the Elizondos. Elizondo, 588 N.E.2d at 502. We found that it did in both regards. Id. at 504, 505.

We noted that Mennonite requires a mortgagee to receive "notice reasonably calculated to appraise him of a pending tax sale," and that "constructive notice alone" was not constitutionally sufficient. Id. at 503 (quoting Mennonite, 462 U.S. at 798). At the same time, constitutional sufficiency depended on the practicalities and peculiarities of each case, and the U.S. Supreme Court had rejected establishing a specific formula to balance the interests of the State and the mortgagee. Id. In our view, the 1980 amendment to the tax sale statutes, and specifically Indiana Code § 6-1.1-24-4.2, properly balanced those interests.

We said the statutory procedure "protects the State's interest in receiving taxes while relieving it of the sometimes tremendous administrative burden of checking all public records to ascertain whether any mortgages have been taken on the property, whether these mortgages are viable, and whether the address on the mortgages is dependable." Id. at 503–04. At the same time, "the interest-holder's ability to take reasonable steps to protect his interest" was "a crucial aspect of the balancing test." Id. at 504. And here, "the interest-holder needed only to complete a simple form to insure notice. The fact that the interest-holder chose not to avail itself of this method of protecting its interest is not sufficient grounds to demand that the State be required to conduct a more burdensome, costly search." Id.

9

With respect to the Elizondos themselves, we noted that they failed to update their address, but at the same time the auditor's office had within its own records several alternative listings. Id. And "[l]ike information in possession of other public officials, knowledge of information contained in records maintained by a county auditor may be imputed to the auditor." Id. The inverse of that was also true: "the auditor does not have knowledge of, nor should be required to seek knowledge of, information contained in records or documents not routinely maintained by and within the auditor's office." Id. We specifically refuted the argument that the auditor was constitutionally required to search the phone book or "records of other offices such as the recorder or the court clerk." Id. All the statute required was for the auditor to send notice to the owner's last known address, "that is, the last address of the owner of the specific property in question of which the auditor has knowledge from records maintained in its office." Id.

The record did not reflect whether any of the alternative addresses within the auditor's office actually linked the Elizondos to the tax sale property. And while it was reasonable to require an auditor who receives an "Unclaimed" notice to search his own office for other addresses, it was not reasonable "to require the auditor to speculate as to whether these possible alternatives are addresses for the property owner who owes taxes on the property in question or another taxpayer with the same name." Id. at 505. This might not be an issue in a small county, with a name as unique as Urbano Elizondo, but when applying a state-wide lens to the question of constitutionality, searching for "Mary Smith" in Marion County or "John Jones" in Lake County would be a much greater problem. Id.

We thus upheld the statute against the Elizondos' constitutional challenge and held that due process required the auditor to search his or her own records for alternate addresses for the owner of the property at issue. Id. But due process did not "require the auditor to engage in speculation as would be the case when there is nothing to link the alternative address to the property at issue." Id.

We reached similar results in Miller Reeder Co. and Griffin. In Miller Reeder Co., the mortgagee also failed to file the proper form to obtain notice of the pre-tax sale, as required by

statute. Miller Reeder Co., 588 N.E.2d at 506. Nor did either of two mortgagees do so in Griffin. Griffin, 589 N.E.2d at 221. In Griffin, however, the auditor took the additional step of sending a form to the county recorder asking if any mortgages were recorded on the subject property; the recorder's response noted "none found" but in fact both mortgages were properly recorded. Id. We nevertheless upheld the statute because "[t]he filing of a mortgage . . . in the recorder's office does not work to enter the mortgagee's name and address in the property tax records maintained in, and relied upon, by the county auditor for the purposes of tax records." Id. The fact that the recorder's office returned "none found" was, in fact, illustrative of "the cumbersome, time-consuming process associated with conducting a search of what may literally be hundreds of thousands of recorded property interests." Id. at 222. An additional goal of the request-notice scheme was, we believed, "to help reduce possible errors in determining what parties hold an interest in the property and, consequently, wish to receive notice." Id.

Finally, a more recent U.S. Supreme Court opinion, Jones v. Flowers, 547 U.S. 220 (2006) also merits review and consideration for its impact on this evolving line of statutes and jurisprudence. Jones owned a home in Arkansas subject to a mortgage. Jones paid the mortgage every month for thirty years, with the mortgagee paying the required property taxes. But after Jones paid off the mortgage, he neglected to pay the property taxes and the property was certified as delinquent and subject to a tax sale.[6] The Commissioner of State Lands mailed a certified letter to Jones at the home, providing notice of the delinquency, the pending tax sale, and Jones's right to redeem. The letter was returned marked "Unclaimed." The Commissioner published a notice of the sale in a local newspaper and ultimately the property was sold. At that point the Commissioner mailed Jones another certified letter at the same address, notifying him that the home would be sold if he failed to redeem. This letter also came back "Unclaimed." After a statutory post-sale redemption period passed, the purchaser served an unlawful detainer notice on

---

[6] Jones no longer lived there by then, having moved into an apartment after divorcing his wife four years prior. His wife and daughter apparently still lived in the home.

11

the property which was received by Jones's daughter. That was the first time Jones heard of the delinquency, the sale, or his right to redeem. The Arkansas Supreme Court determined that "attempting to provide notice by certified mail satisfied due process in the circumstances presented," and affirmed the sale and transfer of the deed. Id. at 225.

The U.S. Supreme Court reversed, holding "that when mailed notice of a tax sale is returned unclaimed, the State must take additional reasonable steps to attempt to provide notice to the property owner before selling his property, if it is practicable to do so." Id. at 226. The issue was "whether due process entails further responsibility when the government becomes aware prior to the taking that its attempt at notice has failed." Id. at 227. And while the letters mailed by certified mail were reasonably calculated to reach Jones and provide him notice, "it does not alter the reasonableness of the Commissioner's position that he must do nothing more when the notice is promptly returned 'unclaimed.'" Id. at 232. To the contrary, the Court identified a number of additional reasonable steps that the Commissioner could have taken to notify Jones, such as resending the notice by regular mail, posting notice on the front door, or addressing the letter to "occupant." Id. at 234–35.

At the same time, the Court drew a line at searching for Jones's address "in the Little Rock phonebook and other government records such as income tax rolls." Id. at 235–36. "An open-ended search for a new address—especially when the State obligates the taxpayer to keep his address updated with the tax collector—imposes burdens on the State significantly greater than the several relatively easy options outlined above." Id. at 236 (internal citation omitted). Nevertheless, the Court said that when a state learns that notice has not been received it "cannot simply ignore that information in proceeding to take and sell the owner's property." Id. at 237. And in Jones, "additional reasonable steps were available for Arkansas to employ before taking Jones's property." Id. at 238.

Despite a statement by the U.S. Supreme Court in Jones that it wanted to avoid prescribing the form of notice required, or redrafting a state's notice statute, see id. at 238, that was exactly the impact in Indiana. In 2007, the General Assembly amended Indiana Code § 6-

12

1.1-24-2 to require additional steps in the event a notice is returned marked "Unclaimed." See Ind. Code § 6-1.1-24-4 (2010); Act of April 26, 2007, P.L. 89-2007, § 2, 2007 Ind. Acts 1371. Those additional steps mirror the steps from Jones of mailing by first class mail, posting notice at the property, or researching auditor records to determine a more complete or accurate address. Id. But see Marion Cnty. Auditor v. Sawmill Creek, LLC, 964 N.E.2d 213 (Ind. 2012) (incorporating Jones into due process framework but highlighting difference between mail returned "unclaimed" and mail returned "not deliverable as addressed, unable to forward" and noting information learned from such marking makes first-class mail attempt unreasonable).

## II. Did Jones Abrogate Elizondo with Respect to Mortgagees?

As an initial matter, it is unmistakable that Jones creates tension over the viability of at least part of our decision in Elizondo. Certainly if a county auditor in Indiana today sent a notice to a property owner and received it back marked "unclaimed," then Jones would compel the additional steps of at least mailing the notice by first class mail, posting it on the front door, and/or addressing it to "occupant." And to the extent there was any flexibility in Jones to not take those steps, the 2007 legislative amendment removed it. Thus, we think it safe to say that the portion of Elizondo dealing with a property owner has been abrogated to the extent it implies an auditor may receive a notice back "unclaimed" and then effectively sit on his or her hands and do nothing more—and if the abrogation was not by Jones, then definitely it was by statutory amendment.

Monroe Bank goes further, though, and argues that Jones abrogated Elizondo with respect to its holding on the mortgagees as well. It claims this is true because "[j]ust as Jones had failed to comply with the Arkansas statute to update his address with the county, Monroe Bank did not request that it be provided certified mail notice prior to a tax sale under Indiana Code Section 6-1.1-24-3(b)." (Appellee's Br. at 13.) Monroe Bank therefore analogizes "[r]equiring a mortgagee with a publicly recorded mortgage to request notice as a condition precedent to receiving notice" to "requiring an owner to update his address in order to receive

13

presale notice," an idea that Monroe Bank believes "Jones clearly rejects." (Appellee's Br. at 14.) We disagree with this assertion.

For one thing, Jones did not deal with the issue of notice required to a mortgagee, and the U.S. Supreme Court is not in the habit of deciding issues not presented to it, or involving entities not party to the suit or statutes not being applied. See U.S. Const. Art. III, § 2; Mennonite, 462 U.S. at 804 n.2 (declining to address constitutionality of 1980 amendment to tax sale statutes). Moreover, analysis of the sufficiency of notice in a property deprivation matter under the Due Process clause of the Fourteenth Amendment turns on "the practicalities and peculiarities of the case," and "will vary with circumstances and conditions." Elizondo, 588 N.E.2d at 503.

The U.S. Supreme Court has always addressed these cases independently based on the class of interest at stake, see Jones, 547 U.S. at 229 (citing Mullane v. Cent. Hanover Bank & Trust Co., 339 U.S. 306 (1950) (beneficiaries of common trust fund), Mennonite, 462 U.S. at 791 (mortgagees), Dusenbery v. United States, 534 U.S. 161 (2002) (owners of seized money and cars), Tulsa Prof'l Collection Servs., Inc. v. Pope, 485 U.S. 478 (1988) (creditors of estate), and Greene, 456 U.S. at 444 (tenants in public housing)), and so have we, see Elizondo, 588 N.E.2d at 502, 504. While those cases relate to, inform, and persuade each other, it would be erroneous to presume that they control issues and parties beyond their own scope. Each class of interest merits its own analysis.

And furthermore, while the U.S. Supreme Court has the authority to overturn our decisions or declare them (and our statutes) unconstitutional under the U.S. Constitution, and the General Assembly has the obvious power to abrogate our case law by enactment or amendment of statutes, it remains the function of this Court to determine the scope or impact of a U.S. Supreme Court decision on our jurisprudence when that decision does not address the issue, parties, or statute involved. See In re Petition to Transfer Appeals, 202 Ind. 365, 376, 174 N.E. 812, 817 (1931); State ex rel. Meyer-Kiser Bank v. Super. Ct. of Marion Cnty., 202 Ind. 589, 600, 177 N.E. 322, 325–26 (1931); cf. Agostini v. Felton, 521 U.S. 203, 237–38 (1997). The U.S. Supreme Court did not address section 6-1.1-24-3(b) in Jones and the General Assembly

14

did not amend that provision post-Jones. Thus, regardless of how Elizondo has been flagged in online publications, see Marion Cnty. Auditor v. Sawmill Creek, LLC, 938 N.E.2d 778, 786 n.4 (Ind. Ct. App. 2010), vacated on trans., it has remained—and still remains—the law with respect to the pre-sale notice required to mortgagees in the state of Indiana unless and until this Court, the Indiana General Assembly, or the U.S. Supreme Court says otherwise.

**III. Does Section 6-1.1-24-3(b) Provide Constitutionally Sufficient Notice to a Mortgagee?**

Monroe Bank's argument is an invitation for us to revisit that portion of Elizondo dealing with mortgagees and reach a different conclusion in light of Jones's holding with respect to property owners. For the reasons we discuss below, our conclusion remains the same.

Prior to the government's taking of a property interest, "due process requires the government to provide 'notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.'" Jones, 547 U.S. at 795 (quoting Mullane, 339 U.S. at 314). "The means employed must be such as one desirous of actually informing the absentee might reasonably adopt to accomplish it." Mullane, 339 U.S. at 315. Any assessment of the constitutional adequacy of the notice must balance "the interest of the State" against "the individual interest sought to be protected by the Fourteenth Amendment." Id. at 314. Here, we assess the sufficiency of notice given prior to the State initiating a process that, if uninterrupted, would extinguish a mortgagee's interest in the collateral supporting the mortgage.

As for the private interest at stake, it is unequivocal that "a mortgagee possesses a substantial property interest that is significantly affected by a tax sale." Mennonite, 462 U.S. at 798. "[A] mortgagee acquires a lien on the owner's property which may be conveyed together with the mortgagor's personal obligation to repay the debt secured by the mortgage." Id. This security interest usually—but not always—takes precedence over liens subsequently attached to the same property, and if the full tax sale and redemption process were run to its conclusion, that

15

security interest would be nullified.  Id.  Thus, the mortgagee "is entitled to notice reasonably calculated to apprise him of a pending tax sale."  Id.

All of this does not, however, necessarily compel the conclusion that in our weighing of the State's interest and the private interest, a mortgagee's interest will tip the scale to the same degree as a property owner's and thus impose the same burden on the State.  Put simply, a mortgagee is not a property owner.  See id. at 793 n.1 ("Because a mortgagee has no title to the mortgaged property under Indiana law, the mortgagee is not considered an 'owner' for purposes of [the tax sale statutes]."); Ind. Dept. of State Revenue v. Colpaert Realty Corp., 231 Ind. 463, 469, 109 N.E.2d 415, 418 (1952) ("In Indiana a mortgage is a lien—a mere security for the debt. The mortgagee has no title to the land mortgaged."); cf. Baldwin v. Moroney, 173 Ind. 574, 580, 91 N.E. 3, 6 (1910) (mortgagee not "deemed the owner" under tax laws unless mortgagee takes possession of mortgaged property).

The more operative question is whether Indiana Code § 6-1.1-24-3(b) is reasonably calculated, under all the circumstances, to provide a mortgagee with notice of the pending tax sale.  Or, more specifically to Monroe Bank's actual claim, whether it is constitutionally permissible for the statute to condition the first-class mailing of actual notice on a requirement that the mortgagee first affirmatively request such notice by way of a simple form.

As we said in Elizondo, the State implemented this procedure to "protect[] the State's interest in receiving taxes while relieving it of the sometimes tremendous administrative burden of checking all public records to ascertain whether any mortgages have been taken on the property, whether these mortgages are viable, and whether the address on the mortgages is dependable."  Elizondo, 588 N.E.2d at 503–04.  At the same time, "[t]he interest holder will be certain to receive notice and take whatever action deemed appropriate by simply filing the necessary form in the auditor's office."  Id. at 504.

To that end, Monroe Bank says "the decision in Jones reaffirms the principle in Mennonite that a party's ability to take steps to safeguard its own property interests does not

16

relieve the State of its constitutional obligation to provide adequate notice prior to the taking of a protected property interest." (Appellee's Br. at 13.) According to Monroe Bank, our decision in Elizondo "ignored" that "important constitutional principle" and "[t]hus, where, as here, the mortgagee has a publicly recorded mortgage, Mennonite and Jones support the conclusion that due process requires that the government provide pre-tax sale notice by mail or personal service, regardless of whether the mortgagee has requested it." (Appellee's Br. at 14.)

It is ironic that Monroe Bank acknowledges a mortgage must be properly recorded in order for the mortgagee's interest to be protected. It is axiomatic that responsibility for this recording—and the consequences for failure to do so—fall on the mortgagee. And if, hypothetically, Monroe Bank failed to comply with the statutory requirement to properly record its mortgage, we do not imagine it would argue that its property interest had been unconstitutionally taken after a tax sale. Thus, Monroe Bank leaves us with the argument that it is constitutionally unacceptable for the State to require it to take any action whatsoever under the tax sale statutes, but yet readily accepts—without explaining why it is any different—that the State already requires it to take affirmative steps pursuant to our recording statutes.

If nothing else, this acceptance of statutory obligation on one hand—coupled with a denunciation for a different statutory obligation on the other hand—leads us to believe that the statement that "a party's ability to take steps to safeguard its interests does not relieve the State of its constitutional obligation," Mennonite, 462 U.S. at 799, was not, in fact, a wholesale repudiation of any and all such statutory obligations. After all, even Mennonite notes that a mortgage must be properly recorded in order for the interest to be protected. Id. at 798.

Instead, the statement refers to the relative sophistication of a party and its ability, in the context of our earlier statute requiring only constructive notice to a mortgagee, to "have means at their disposal to discover whether property taxes have not been paid and whether tax sale proceedings are therefore likely to be initiated." Id. at 799. Whether a mortgagee has those means or not, constructive notice is "designed primarily to attract prospective purchasers to the tax sale," and is "unlikely to reach those who, although they have an interest in the property, do

17

not make special efforts to keep abreast of such notices." Id. In other words, just because a mortgagee *might* have the means and wherewithal to scan tax sale notices for properties for which it holds a mortgage, does not mean the State can solely rely on such a method—because such notice is geared to persons seeking to *obtain* an interest in real property, not to persons seeking to *protect* an existing interest in a particular parcel of real property.

Indeed, as the Mennonite dissent pointed out, the party's actual ability to protect itself had long been a factor to be considered when analyzing the "totality of circumstances" in a due process claim. Id. at 803 (O'Connor, J., dissenting) (citing Mullane, 339 U.S. at 315). And the majority likewise specifically highlights that a party's *in*ability to protect itself is a factor to consider, in that "particularly extensive efforts to provide notice may often be required when the State is aware of a party's inexperience or incompetence." Id. at 799. Most often, this consideration has taken the form of a state's failure to take additional steps when it knows its "usual" method will be unsuccessful—and, notably, in those circumstances the due process violation had nothing to do with the State's requirement that a party take initial, affirmative steps to protect its interest.

For example, in Robinson v. Hanrahan, 409 U.S. 38 (1972), the Court found a due process violation where the State mailed notice of a forthcoming forfeiture proceeding to a criminal defendant's home of record—an address the defendant was required to keep updated by statute—but it was known at the time that the defendant did not live there because he was incarcerated by the State. Id.; see also Jones, 547 U.S. at 232 (noting requirement in Robinson that defendant affirmatively register his mailing address, and pointing out that "we found that the State had not provided constitutionally sufficient notice, *despite having followed its reasonably calculated scheme*, because it knew that Robinson could not be reached at his address of record" (emphasis added)). And likewise in Jones, the flaw was not that the State required the property owner to keep his address updated, which it did by statute, but that the State failed to take additional steps aimed at notifying the owner after the mailed notice was returned unclaimed. Jones, 547 U.S. at 225.

18

But more to the point, Monroe Bank's apparent alternative—that a county auditor be required to comb the files of the recorder's office to see if a mortgage is recorded for a tax-delinquent property, assess whether the mortgage is still valid, and then determine whether the mortgage accurately reflects the mortgagee's identity and address—remains unnecessary for two reasons:  it would unreasonably tip the scales of our analysis by imposing too great a burden on the State, and the burdens this approach would impose would not result in a greater likelihood of successful notification.

First, as discussed above, we have refused to require the State to take such additional and burdensome steps.[7]  Elizondo, 588 N.E.2d at 504; see also Griffin, 589 N.E.2d at 221–22.  And Jones makes clear that this rejection remains valid and that this sort of "open-ended" cross-agency search is not constitutionally necessary and imposes "significantly greater" burdens on

---

[7] The various amici in support of M & M provide some attempt to quantify the cost of this burden.  The State notes that such a search equates to a comprehensive title search which, on parcels of land with relatively low value, can often cost more than the sum of delinquent taxes.  (State's Amicus Br. on Trans. at 11–12 (citing Frank S. Alexander, Tax Liens, Tax Sales, and Due Process, 75 Ind. L.J. 747, 789 (2000)).)  The Association of Indiana Counties estimates the cost of just one title search at between $115 and $175, and with over 55,000 tax sale-eligible parcels in Indiana in 2011 alone, presents a minimum additional cost—though divvied amongst the counties—at over $6 million.  (Assoc. of Ind. Cnty's Amicus Br. on Trans. at 4.)  Though some percentage of this cost would be recouped as a result of tax sales, it would appear that millions would still be borne by the county's general tax base—and specifically by those county residents who are *not* delinquent in their own property taxes.  (SRI, Inc.'s Amicus Br. on Trans. at 9–10.)  And the Indiana County Auditor's Association estimates an annual burden of 4,600 employee hours to accomplish these searches.  (Ind. Cnty Auditor's Assoc., Inc.'s Amicus Br. on Trans. at 4.)

The Indiana Bankers Association calls these projections speculative and unreliable, and argues that the additional searches required would result in a greater success rate in terms of payment of delinquent taxes because mortgagees "would step forward when property owners do not and would remit the delinquent taxes to the county" because they "generally are in a better financial position to pay those taxes than are property owners who have fallen behind and mortgagees want to protect their collateral." (Ind. Bankers Assoc. Amicus Br. on Trans. at 10.)  We agree with the IBA that the cost projections are no doubt speculative in some degree—but so are its presumptions that mortgagees would step forward to promptly remit property taxes.

the State.  Jones, 547 U.S. at 235–36.  "We do not believe the government was required to go this far."  Id. at 236.

Moreover, as we discussed before, the General Assembly briefly adopted legislation in line with Monroe Bank's position by way of the 1986 statutory amendment to section 6-1.1-24-4.2.  But just a few years later in 1989 it reinstated the requirement that a mortgagee request notice by repealing section 6-1.1-24-4.2 and enacting the section 6-1.1-24-3(b)—and that is the way the statute has remained ever since.  This certainly appears to be nothing less than a legislative repudiation of assigning such a burdensome process to county officials.

But second, when the means employed by the State to provide notice must be "such as one desirous of actually informing the absentee might reasonably adopt to accomplish it," and be "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections," Mullane, 339 U.S. at 314–15, we believe even the expensive and time-consuming title search through a recorder's office cannot reasonably be conceived of as leading to the actual name and address of the actual mortgagee with an interest in the property—not in today's era of mortgage-backed securities and trading.  In fact, the more likely result for these cases on the whole would be a *lower* accuracy rate than the method currently in place—a factor we must weigh significantly in our analysis. Cf. Mathews v. Eldridge, 424 U.S. 319, 344 (1976) ("[P]rocedural due process rules are shaped by the risk of error inherent in the truthfinding process as applied to the generality of cases, not the rare exceptions.").

We recently explored the complexities, perils, and pitfalls of the modern mortgage environment in Citimortgage, Inc. v. Barabas, 975 N.E.2d 805 (Ind. 2012), reh'g denied, and described the mix of borrowers, lenders, loan servicers, brokers, underwriters, etc., as a "mass delusion" far beyond the traditional—and virtually nonexistent these days—exchange involving only a borrower and a lender.  Id. at 808.  This delusion began in the 1970s with the development of mortgage-backed securities, wherein a mortgage is sold, bundled, and re-sold amongst investment banks.  This "used to require multiple successive assignments, each of which had to

20

be recorded on the county level at considerable inconvenience and expense to the investment banks involved." Id. at 809.

But in the 1990s, a number of those investment banks collaborated in establishing Mortgage Electronic Registration Systems, Inc. MERS, as it is known, operates a database identifying the servicing, ownership, and assignment rights for mortgage loans throughout the United States, and member banks identify MERS as "nominee" and "mortgagee" on the mortgage. Id. The member banks can then buy, sell, and trade those mortgages internally without ever having to update or notify a county recorder's office—creating an information hurdle that can result in chaos when issues like foreclosure arise.[8] See id. at 809 n.4 ("There is no public record of the real party in interest in these mortgages, and MERS does not require member banks to report transfers. The resulting paucity of information has caused significant confusion for banks, borrowers, and courts." (internal citation omitted)).

Today, some sixty percent of the nation's mortgages are *not* recorded in the name of the actual lender, its assignee, or a party with any economic interest in the debt or collateral—instead, even the most comprehensive title search on such a property would reveal only MERS. See id. at 809. And while we noted that—in the context of the particular contract at issue in Citimortgage and the foreclosure statutes—MERS was effectively the lender's agent for service of process in a foreclosure suit, id. at 814–15, we explicitly rejected a request to expand our

---

[8] For example, in Citimortgage a buyer received a mortgage from Irwin Mortgage Company, a MERS member bank. The mortgage contained language identifying MERS as mortgagee and nominee, and provided an address for a centralized MERS office. Years later, the buyer took a second mortgage from ReCasa Financial Group—a non-member bank. The buyer fell behind on the second mortgage and ReCasa successfully filed a foreclosure suit against the buyer and Irwin Mortgage, but did not serve notice on MERS. Unbeknownst to ReCasa, Irwin Mortgage's interest had been bought and sold and was then owned by Citimortgage. MERS assigned the mortgage to Citimortgage and Citmortgage then intervened to set aside the foreclosure judgment. Ultimately, this Court held that Citimortgage could rightfully intervene and protect the priority of its lien. Citimortgage, 975 N.E.2d at 818.

definition of "mortgagee" to "an entity like MERS that neither holds title to the note nor enjoys a right of repayment," id. at 817.

No reason has been presented to us, nor do we find one *sua sponte*, to assume that the agency relationship MERS has with its member banks extends to service of process in tax sales.[9] Thus, even if we were to require a county auditor to perform a burdensome title search through the recorder's office, in a substantial percentage of cases the identity of the actual mortgagee would still not be "reasonably identifiable." Mennonite, 462 U.S. at 798 (constructive notice alone insufficient when "*mortgagee* is identified in a mortgage that is publicly recorded" (emphasis added)). Instead the auditor would have to contact MERS, request the identity and address of the actual mortgagee, validity of the mortgage and debt, and—assuming MERS would release the information in response to a non-foreclosure action—send a certified letter to the mortgagee and hope that the mortgage did not change hands again in the interim.[10] All of this would therefore only serve to increase the State's financial and time burdens with little return in terms of reliability.[11] See id. at 798 n.4 ("We do not suggest, however, that a governmental body

---

[9] Significant to our decision in Citimortgage was that the foreclosure statutes require "the mortgagee or an assignee shown in the record" to be named as defendants, Ind. Code § 32-29-8-1 (2008), but here notice under the tax sale statutes is only to be sent to the mortgagee, Ind. Code § 6-1.1-24-3, and the owner(s) of record, Ind. Code § 6-1.1-24-4.

[10] One of the additional challenges in Citimortgage, for example, was that Irwin Mortgage—having already sold its interest in the property—responded to the foreclosure suit by filing a disclaimer of its interest, leading ReCasa and the trial court to believe that there was no superior lien on the property. Citimortgage, 975 N.E.2d at 810.

[11] And this says nothing of the fact that membership in MERS is not a requirement in the exchange of mortgage-backed securities. It is a company providing a service that banks can join. In alternative instances where a bank participates in the mortgage-backed securities market but elects not to join MERS, instances which are unidentifiable from the face of the recorded mortgage, the perils of relying on the mortgagee as identified by a title search are even greater.

> Because transactions involve the assignment of hundreds or even thousands of mortgages, there is a temptation to skip the step of recording an assignment in the public records, particularly when the assignment is only a temporary collateral assignment. Transactions sometimes take the form of nothing more than an unrecorded pledge of the

is required to undertake extraordinary efforts to discover the identity and whereabouts of a mortgagee whose identity is not in the public record.").

In short, the *only* reasonably certain way for an auditor to know who has a viable mortgage on a property so that adequate notice may be sent to the proper party is for the mortgagee to complete a simple form and submit it to the auditor. Whether mortgagees do this on their own, or an entity similar to MERS steps in and performs the task as an agent, this is hardly an onerous burden in light of the benefit obtained; and is far less onerous than the burdens the alternative would place on the State in exchange for a far lower degree of benefit.

Therefore our conclusion today is no different than the conclusion we reached over two decades ago in Elizondo. In balancing the interests of the State and the interests of the pertinent class, and in light of the particular circumstances and conditions relevant to the class and its property interest, the statutory requirement that a mortgagee complete a form aimed at guaranteeing notice before a property is put up for a tax sale is a "means employed . . . such as one desirous of actually informing the absentee might reasonably adopt to accomplish it," and therefore not offensive to the U.S. Constitution.[12] Mullane, 339 U.S. at 315.

---

mortgages in bulk to the bank, together with delivery of the original notes to the bank for perfection. In many instances, even the task of holding possession of the notes is outsourced to a bailee who holds the notes for the bank's benefit. The mortgages might be transferred many times by unrecorded assignment in bulk without physically moving the notes, but with the bailee simply signing a receipt changing the name of the lender for whom it holds the notes.

David E. Peterson, Cracking the Mortgage Assignment Shell Game, 85 Fla. B.J. 10, 11 (2011). Moreover, even when the lender bank remains the holder of the mortgage, that does not guarantee that the auditor's request for a lien search from the recorder will be successful. See, e.g., Griffin, 589 N.E.2d at 221.

[12] Monroe Bank also challenges the final section of Indiana Code § 6-1.1-24-3(b), which provides that even when a mortgagee files the form requesting notice, "failure of the county auditor to mail this notice or its nondelivery does not affect the validity of the judgment or order." Monroe Bank argues that this

**Conclusion**

The requirement found in Indiana Code § 6-1.1-24-3(b), that a mortgagee annually request, by certified mail, a copy of notice that a parcel of real property is eligible for sale under the tax sale statutes, does not violate the Fourteenth Amendment's Due Process Clause. We therefore reverse the trial court and remand.

Dickson, C.J., Rucker, Massa, and Rush, JJ., concur.

---

"savings clause" effectively excuses failure on the part of the auditor even when that failure wholly deprives a mortgagee of notice of the pendency of a tax sale. Because we find no violation of the Due Process Clause with respect to the requirement that a mortgagee submit the request form to the auditor's office—and it is unequivocal that Monroe Bank did not do so here—we need not reach the merits of this issue.

We nevertheless tend to agree with Monroe Bank on this point, though, and it may be wise for the General Assembly to address this clause before it becomes a central or dispositive issue in a case. To be sure, it certainly seems significant that neither M & M nor the State, nor any of the amici in support of M & M, offered any arguments to the contrary on this point. But regardless, we also note that even if we reached the merits of this issue and held this clause unconstitutional in light of Jones's point that the State cannot simply ignore information it has within its possession when proceeding to take a private property interest, Jones, 547 U.S. at 237, that would not mean—in this case—that Monroe Bank deserved relief.

That is because "[a] statute bad in part is not necessarily void in its entirety." Smylie v. State, 823 N.E.2d 679, 685 (Ind. 2005) (quoting Dorchy v. Kansas, 264 U.S. 286, 289–90 (1924)), cert. denied. "Provisions within the legislative power may stand if separable from the bad. But a provision, inherently unobjectionable, cannot be deemed separable unless it appears both that, standing alone, legal effect can be given to it and that the legislature intended the provision to stand, in case others included in the act and held bad should fall." Id. It certainly appears that the "savings clause" is severable from the remainder of section 6-1.1-24-3(b), and therefore a finding that it is unconstitutional would not adversely affect our decision that the form requirement is constitutional.