**Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



FILED

Feb 26 2014, 10:03 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**JULIANNE L. FOX**
Vanderburgh County Public Defender's Office
Evansville, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**ROBERT J. HENKE**
Deputy Attorney General
Indianapolis, Indiana

**CHRISTINE REDELMAN**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

IN THE MATTER OF THE TERMINATION OF )
THE PARENT-CHILD RELATIONSHIP OF: )
L.C., Minor Child, )
                                 )
R.C., Father, )
                                 )
     Appellant-Respondent, )
                                 )
         vs. )     No. 82A01-1307-JT-297
                                 )
INDIANA DEPARTMENT OF CHILD )
SERVICES, )
                                 )
     Appellee-Petitioner. )

APPEAL FROM THE VANDERBURGH SUPERIOR COURT
The Honorable Brett J. Niemeier, Judge
Cause No. 82D01-1206-JT-70

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**BROWN, Judge**

R.C. ("Father") appeals the involuntary termination of his parental rights to his son, L.C. Father raises three issues, which we consolidate, revise, and restate as:

I.  Whether the court abused its discretion in denying a motion to intervene filed by paternal grandmother; and

II. Whether the evidence is sufficient to support the trial court's judgment terminating his parental rights.

We affirm.

FACTS AND PROCEDURAL HISTORY

On July 17, 2011, B.P., a sibling of then one-year-old L.C., tested positive for amphetamine and methamphetamine at birth, and the mother of both children ("Mother") admitted that she used methamphetamine on several occasions during her pregnancy.[1] The next day, the Department of Child Services ("DCS") received a report alleging that L.C. and B.P. were Children in Need of Services ("CHINS"). At the time, L.C. was in the care of Father's mother ("Grandmother") in the State of Kentucky. Specifically, Mother indicated to DCS Family Case Manager ("FCM") Kelly Whitledge that L.C. had been "visiting with [Grandmother] in Bowling Green, Kentucky" and that he had been "going back and forth for a few weeks at a time between [Mother] and [Grandmother]." DCS Exhibit 2 at Preliminary Inquiry pp. 1-2. FCM Whitledge also spoke with

_____

[1] Mother voluntarily consented to the termination of her parental rights and does not participate in this appeal.

2

Grandmother at this time, and Grandmother "reported that she has had [L.C.] since January 2011 and is pursuing custody and/or guardianship." Id. at 2. FCM Whitledge indicated in her Preliminary Inquiry that Grandmother refused to bring L.C. to Indiana and that she received no evidence that Grandmother had filed for custody or guardianship of him, and Grandmother brought L.C. to Indiana only after receiving a court order to do so.

On July 21, 2011, DCS filed a Verified Petition Alleging Child in Need of Services pertaining to L.C. (the "CHINS Petition"). The CHINS Petition stated that Father had "not established paternity for the child and does not exercise consistent parenting time with the child" and that he has a criminal history and had been previously incarcerated due to possession of illegal drugs, and it noted that Father's address was "[u]nknown." DCS Exhibit 2 at CHINS Petition. That same day, the court held an initial/detention hearing at which Father was not present. Mother admitted to the CHINS allegations, and the court adjudicated L.C. a CHINS and ordered that L.C. be returned to the court's jurisdiction and placed with DCS. At the time of the hearing, Father had an active warrant and was avoiding arrest, and despite attempts DCS was unable to notify Father regarding the hearing through either Mother or Grandmother.

On July 27, 2011, the court placed L.C. in the custody of Grandmother and her husband over DCS's objection, and ordered drug tests for each of the home's occupants and that Father have no contact with L.C. until he appeared before the court. The next day, DCS appeared and requested that L.C.'s placement be changed to foster care because Grandmother's husband had tested positive for methamphetamine and had a

criminal history and a daughter of Father who was living with Grandmother tested positive for marijuana. L.C. was placed with the same foster family who had been caring for B.P. On July 29, 2011, Father was arrested in Kentucky pursuant to the active warrant.

On August 17, 2011, the court entered its Order on initial/detention hearing authorizing L.C.'s removal and placement in foster care. The Predispositional Report filed by DCS on the same day indicated that Father had not appeared on the matter and that his whereabouts were still unknown. On August 24, 2011, the court held a dispositional hearing at which Mother appeared. On September 28, 2011, the court entered its dispositional order and noted that a Parental Participation Petition had been filed for Mother and that Father had not refused to sign the petition, but that he was incarcerated in Kentucky.

On April 19, 2012, Father appeared telephonically while in custody at another initial/detention hearing at which he waived his right to counsel and indicated that he wished to be present by phone for any future court dates. The court ordered that Father "take any classes if any are available and to immediately notify [his] case manager upon his release." Appellant's Appendix at 3. On April 30, 2012, the court entered its Order on Continued Initial Hearing stating that Father did not object to L.C.'s adjudication as a CHINS, and reaffirmed L.C.'s CHINS adjudication. The order also noted Father's request that Grandmother be considered for placement of L.C., and ordered DCS to consider such placement and inform the court of its recommendation. The order also set a permanency hearing for June 13, 2012. On June 12, 2012, DCS filed an Interstate

4

Compact on the Placement of Children ("ICPC") Request to have child services representatives from the State of Kentucky evaluate Grandmother's home. DCS Exhibit 7.

On June 13, 2012, the court held a permanency hearing at which Father appeared telephonically and was appointed counsel. Father challenged the permanency report that had been filed by DCS. That same day, DCS filed its Petition to Terminate Parental Rights.[2] On June 27, 2012, Mother signed a voluntary termination of her parental rights "per an agreement with the foster parents adopting." Transcript at 76.

On August 6, 2012, the Cabinet for Families and Children in Kentucky filed the Relative Home Evaluation (the "ICPC Evaluation") regarding Grandmother's home which recommended that L.C. not be placed with her. Specifically, the ICPC Evaluation states that Grandmother "had been declared 100% disabled and does not work outside of the home," notes that she has been diagnosed with diabetes, arthritis, seasonal allergies, hypertension, nerve damage, and has had a stroke, and is on various medications to deal with these medical conditions. DCS Exhibit 7. The report also notes that she has $49 per month left over after paying for rent and utilities, as well as $168 per month in food stamp benefits. The ICPC Evaluation recommended L.C. not be placed with Grandmother due to her health problems and lack of income, as well as the fact that L.C. "has a sibling with him in his current placement" and would be separated from his sibling if he were placed with Grandmother. Id.

---

[2] We note that the petition does not appear in the record.

On August 15, 2012, Grandmother filed a Motion to Intervene in both the CHINS and termination matters, and that same day DCS filed an Amended Petition to Terminate Parental Rights.[3] On August 23, 2012, DCS filed objections to Grandmother's motions in both matters, arguing that Grandmother "failed to cooperate with [DCS] and [was] denied placement in Kentucky through ICPC," that at the initiation of the CHINS matter she refused to return L.C., that Father is incarcerated and will be incarcerated until at least 2015, that methamphetamine was recovered from Grandmother's vehicle which belonged to her husband, and that her "sole reason to request to intervene is to obtain placement after the termination for parental rights has been filed. [L.C.] is in a meth free pre-adoptive home. It is not in the best interests of [L.C.] for [Grandmother] to have placement. Therefore, she has no grounds to intervene as a party." DCS Exhibit 2 at Objection to Motion to Intervene. The court held a hearing that same day on Grandmother's motions to intervene in both matters, and denied the motions by entry on the chronological case summaries ("CCS"), basing its rulings on the State of Kentucky's adverse ICPC Evaluation.

DCS filed its Second Amended Petition to Terminate Parental Rights (the "Termination Petition") on January 15, 2013,[4] and on January 17, 2013, the court commenced a termination hearing at which Father appeared by telephone and by counsel. At the termination hearing, Father testified that he was forty years old, that he began using methamphetamine when he was twenty-five years old, and that he believed he was

---

[3] The amended petition does not appear in the record.

[4] The Termination Petition is not contained in the record.

addicted to methamphetamine.  He testified that he had four other children, including two that lived on their own, a fifteen-year-old who lives with Grandmother, and a four-year-old who lives with her mother in South Carolina.  Father testified that he was incarcerated in Lexington, Kentucky, for manufacturing methamphetamine, that he was serving a twenty-five year sentence, and that he was eligible for parole as early as September of 2015 but that he was also attempting to have credit for time served on a federal criminal conviction applied to his sentence.  He stated that prior to his most recent arrest, he was residing "where [he] could," but that he always could stay at his parents' home.  Transcript at 9.  When asked if L.C. had ever resided with him, Father responded that when he "picked [L.C.] up [he] took him to [Grandmother's] so she could take care of him."  Id. at 12.  Father also testified that he was serving time in prison in Indiana and then in Arkansas on a related conviction at the time of L.C.'s birth, that he received a phone call from Mother while in prison asking whether Father could care for L.C. because she could not, and that in November of 2010 Father picked up L.C. and transported him to Grandmother.  He testified that between November 2010 and July 2011 L.C. resided with Grandmother but that he transported L.C. to Indiana on a few occasions for shots and to visit with Mother.  He also testified that he was informed by his oldest son that DCS had taken L.C. from Grandmother on the day it occurred.

On March 22, 2013,[5] the court again reconvened the termination hearing in which Robin Sitzman, who began as the FCM in this matter in November 2012, testified that

---

[5] We observe that the court held proceedings on the Termination Petition on January 29, 2013, and Father moved for a continuance pending a February 12, 2013 hearing for "shock probation" to be

L.C. appeared very comfortable, bonded with his foster family, and was bonded with B.P.

FCM Sitzman testified that the foster family planned to adopt L.C. Mary Minnear, L.C.'s

CASA, testified that L.C. was "really bonded" with his foster family and will stop

playing to give one of them a hug, and she recommended that "it would be best for him to

be adopted by the foster family" because they provide him "a very stable loving home

and his brother is there." Id. at 95.

On June 19, 2013, the court issued its Finding of Facts and Conclusions of Law

terminating the parental rights of Father (the "Termination Order"). The Termination

Order contained Findings of Fact consistent with the foregoing and found regarding

Father's incarceration that his "minimum outdate is January 4, 2026. His maximum

outdate is September 14, 2035." Appellant's Appendix at 15. The court also found that

L.C. "needs stability and permanency" and that "[h]is present pre-adoptive home is

meeting these needs and will be able to do so in the future. He is bonded to his current

placement." Id. at 16. It also found that L.C. was bonded to B.P., who is being adopted

by the current foster family. Id. The Termination Order contained the following relevant

Conclusions of Law:

> The Court finds by clear and convincing evidence the following:
>
> 1. This Court has jurisdiction over the parties and subject matter.
>
> * * * * *

---

held in Kentucky regarding his incarceration, which the court granted over the State's objection. Transcript at 61. At the outset of the March 22, 2013 hearing, Father testified that he had not heard the result regarding his petition for early release and that his situation was unchanged.

6. The Court now finds by clear and convincing evidence that the allegations of the petition to terminate parental rights are true in that:

   a. There is a reasonable probability that the conditions, which resulted in the removal of [L.C.] from the care of his parents, will continue to cause [him] to have placement outside the care and custody of his parents and will not be remedied. The mother has signed a voluntary termination of her parental rights. [Father] has a pattern of instability, not meeting his parental obligations, and is serving an extended criminal sentence.

   b. There is reasonable probability that the continuation of the parent-child relationships between [Father] and his child, [L.C.], pose a threat to the well-being of [L.C.], because of his instability and unavailability.

   c. Termination of the parent-child relationships between [L.C.] and [F]ather is in the child's best interests. The child is in a loving stable pre-adoptive home with his half brother and [F]ather remains in prison.

   d. The plan of [DCS] for the care and treatment of [L.C.] upon termination of his parental rights is adoption, which is highly likely, acceptable and satisfactory.

7. Individuals who pursue criminal activity run the risk of being denied the opportunity to develop positive and meaningful relationships with their children. Matter of A.C.B., 598 N.E.2d 570, 572 (Ind. Ct. App. 1992).

8. The needs of children are too substantial to force them to wait while determining if their incarcerated father or mother would be able to be a parent for them. In re S.P.H., 806 N.E.2d 874, 883 (Ind. Ct. App. 2004).

Id. at 16-18.

DISCUSSION

I.

The first issue raised by Father is whether the court abused its discretion in denying Grandmother's Motion to Intervene. Generally, "[t]he grant or denial of a petition to intervene is within the discretion of the trial court." Herdrich Petroleum Corp. v. Radford, 773 N.E.2d 319, 324 (Ind. Ct. App. 2002), reh'g denied, trans. denied. We review a trial court's decision for an abuse of discretion, which occurs when the decision is clearly against the logic and effect of the facts and circumstances before the court or the reasonable and probable inferences to be drawn therefrom. Id.

Motions to intervene are governed by Indiana Trial Rule 24. That rule provides, in relevant part:

(A)    Intervention of right. Upon timely motion anyone shall be permitted to intervene in an action:

(1)    When a statute confers an unconditional right to intervene; or

(2)    When the applicant claims an interest relating to a property, fund or transaction which is the subject of the action and he is so situated that the disposition of the action may as a practical matter impair or impede his ability to protect his interest in the property, fund or transaction, unless the applicant's interest is adequately represented by existing parties.

(B)    Permissive intervention. Upon timely filing of his motion anyone may be permitted to intervene in an action:

(1)    When a statute confers a conditional right to intervene; or

10

(2) When an applicant's claim or defense and the main action have a question of law or fact in common. When a party to an action relies for ground of claim or defense upon any statute or executive order administered by a federal or state governmental officer or agency or upon any regulation, order, requirement, or agreement issued or made pursuant to the statute or executive administrative order, the governmental unit upon timely application may be permitted to intervene in the action. In exercising its discretion the court shall consider whether the intervention will unduly delay or prejudice the adjudication of the rights of the original parties.

The trial court has discretion to determine whether a prospective intervenor has met its burden under Rule 24. Citimortgage, Inc. v. Barabas, 975 N.E.2d 805, 812 (Ind. 2012), reh'g denied.

Here, we do not reach the merits of or express an opinion on this issue. We observe that an appeal is initiated by filing a notice of appeal. Ind. Appellate Rule 9(A)(1). Here, Grandmother did not file a notice of appeal on her own behalf after the court denied her Motion to Intervene, and instead Father is attempting to assert Grandmother's claim. Thus, Grandmother is not a party on appeal, and as such we conclude that the denial of her Motion to Intervene is not properly before us.[6]

---

[6] Although we conclude that we need not address this issue, we observe that Ind. Code § 31-14-13-2.5(a), which governs the consideration of de facto custodians in custody determinations, provides that "[t]his section applies only if the court finds by clear and convincing evidence that the child has been cared for by a de facto custodian." Ind. Code § 31-9-2-35.5 defines a de facto custodian as "a person who has been the primary caregiver for, and financial support of, a child who has resided with the person for at least: (1) six (6) months if the child is less than three (3) years of age . . . ." As noted above, Mother indicated to FCM Whitledge as part of the preliminary inquiry that L.C. had been "visiting with [Grandmother] in Bowling Green, Kentucky" and that he had been "going back and forth for a few weeks at a time between [Mother] and [Grandmother]." DCS Exhibit 2 at Preliminary Inquiry pp. 1-2. Also, Grandmother testified that Father took L.C. "wherever he wanted to whenever he wanted to." Transcript at 125.

## II.

The next issue is whether the evidence is sufficient to support the trial court's judgment terminating Father's parental rights. When reviewing the termination of parental rights, we will not reweigh the evidence or judge the credibility of the witnesses. Bester v. Lake Cnty. Office of Family & Children, 839 N.E.2d 143, 147 (Ind. 2005). Instead, we consider only the evidence and reasonable inferences that are most favorable to the judgment. Id. In accordance with Ind. Code § 31-35-2-8(c), the trial court's judgment contains specific findings of fact and conclusions thereon. We therefore apply a two-tiered standard of review. First, we determine whether the evidence supports the findings, and second, we determine whether the findings support the judgment. Id. In deference to the trial court's unique position to assess the evidence, we will set aside the court's judgment terminating a parent-child relationship only if it is clearly erroneous. In re L.S., 717 N.E.2d 204, 208 (Ind. Ct. App. 1999), reh'g denied, trans. denied, cert. denied, 534 U.S. 1161, 122 S. Ct. 1197 (2002); see also Bester, 839 N.E.2d at 147. Thus, if the evidence and inferences support the trial court's decision, we must affirm. Id.

"The traditional right of parents to establish a home and raise their children is protected by the Fourteenth Amendment of the United States Constitution." In re M.B., 666 N.E.2d 73, 76 (Ind. Ct. App. 1996), trans. denied. Although parental rights are of a constitutional dimension, the law provides for the termination of these rights when parents are unable or unwilling to meet their parental responsibilities. In re R.H., 892 N.E.2d 144, 149 (Ind. Ct. App. 2008). Moreover, a trial court need not wait until a child

is irreversibly harmed before terminating the parent-child relationship. McBride v. Monroe Cnty. Office of Family & Children, 798 N.E.2d 185, 203 (Ind. Ct. App. 2003).

Before parental rights may be involuntarily terminated in Indiana, the State is required to allege and prove, among other things:

> (B)    that one (1) of the following is true:
>
> > (i)    There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
> >
> > (ii)    There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
> >
> > (iii)    The child has, on two (2) separate occasions, been adjudicated a child in need of services;
>
> (C)    that termination is in the best interests of the child . . . .

Ind. Code § 31-35-2-4(b)(2).[7] The State's burden of proof for establishing these allegations in termination cases "is one of 'clear and convincing evidence.'" In re G.Y., 904 N.E.2d 1257, 1260-1261 (Ind. 2009) (quoting Ind. Code § 31-37-14-2 (2008)), reh'g denied. "[I]f the court finds that the allegations in a petition described in section 4 of this chapter are true, the court shall terminate the parent-child relationship." Ind. Code § 31-35-2-8(a). Father raises challenges under subparagraphs (b)(2)(B) and (b)(2)(C) of the termination statute cited above.

---

[7] As observed by DCS in its brief, Father does not challenge the court's conclusions in the Termination Order regarding Ind. Code § 31-35-2-4(b)(2)(A) and -4(b)(2)(D).

A.    Conditions Remedied / Threat to Well-Being

Ind. Code § 31-35-2-4(b)(2)(B) is written in the disjunctive and requires the State to establish, by clear and convincing evidence, only one of the three requirements of subparagraph 4(b)(2)(B). Because we find it to be dispositive, we limit our review to Father's allegations of error pertaining to subsection (b)(2)(B)(i) of Indiana's termination statute, namely, whether DCS presented clear and convincing evidence establishing that there is a reasonable probability the conditions leading to the removal and continued placement of L.C. outside Father's care will not be remedied.[8] In making such a determination, the court must judge a parent's fitness to care for his or her child at the time of the termination hearing, taking into consideration evidence of changed conditions. In re N.Q., 996 N.E.2d 385, 392 (Ind. Ct. App. 2013). Due to the permanent effect of termination, the trial court also must evaluate the parent's habitual patterns of conduct to determine the probability of future neglect or deprivation of the child. Id. The statute does not simply focus on the initial basis for a child's removal for purposes of determining whether a parent's rights should be terminated, "but also those bases resulting in the continued placement outside the home." Id. A court may properly consider evidence of a parent's prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and employment. Id. (quoting McBride, 798 N.E.2d at 199). The burden for DCS is to establish "only that there is a reasonable probability that the parent's behavior will not change." Id.

---

[8] We observe that, indeed, that the vast majority of Father's arguments pertain to this subparagraph.

The crux of Father's position is that the court "clearly erred when it determined that the CHINS could not be litigated on the merits of the case during the termination proceeding," that indeed, L.C. should not even have been adjudicated as a CHINS, and that as such there are not conditions which even require being remedied. Appellant's Brief at 9. Father cites to In the Matter of C.M., 675 N.E.2d 1134 (Ind. Ct. App. 1997), for the proposition that "[t]he differences in the nature and consequences of a CHINS proceeding as compared to a Termination of Parental Rights make collateral estoppel inappropriate." Id. Regarding the underlying CHINS proceedings Father argues that DCS knew L.C. was residing with Grandmother in Kentucky and that the caseworker "saw nothing that gave rise to any concerns for the care giving by [Grandmother]," noting that she "was given unsupervised visitation with [L.C.] throughout the proceedings . . . ." Id. He also notes that four caseworkers handled this case during the two-year CHINS process and that "[a]ccording to two of them, things such as service of process and visitation, although required or ordered by the court, did not occur." Id. He argues that L.C. "simply was not a [CHINS] as he was adequately being cared for by [Grandmother]" and that DCS could have or should have merely advised Grandmother to seek legal custody rather than remove L.C. from his home state of Kentucky. Id. at 10. Father also asserts that L.C. had relationships with four other siblings which were effectively severed by DCS's actions, and that it was the actions by DCS which created the instability in L.C.'s life. Father further suggests that L.C.'s home state pursuant to the Uniform Child Custody Jurisdiction Act was Kentucky at the time the CHINS was filed, that Kentucky was the proper state to handle anything concerning the child, and that

because "no conditions required the remedy of a CHINS action, the Court's Conclusion 6.a. is clearly erroneous." Id. at 12.

DCS begins by arguing that any error occurring at the CHINS stage was invited by Father, noting that the record reveals that Father had been in contact with Grandmother and knew that L.C. had been removed by DCS, but yet he avoided involvement with the CHINS case. DCS notes Father's statement in his brief that he was under the impression that Grandmother would get custody of his son, and argues that it is indicative of Father's mindset, specifically that Grandmother "would do his job for him, as he *admittedly* was not fit to care for [L.C.] and could not provide [L.C.] stability." Appellee's Brief at 18. DCS also argues that Father waived any alleged error which occurred at the CHINS proceedings and cites to Adams v. Marion Cnty. Office of Family and Children, 659 N.E.2d 202, 205-206 (Ind. Ct. App. 1995), for the proposition. DCS also notes that although Father objected to the CHINS determination at the termination hearing, he does not demonstrate that he ever objected during the CHINS stage which results in waiver of this issue.

Regarding the merits of the court's Termination Order itself, DCS notes that Father does not challenge any of the court's findings of fact and that accordingly we need not look to the evidence but only to the findings to determine whether they support the judgment. DCS argues that the evidence was clear and convincing that Father could not adequately parent L.C., and that he will be unavailable to do so in the future, noting specifically that the court may consider his criminal history and history of drug and alcohol abuse. DCS also notes that at the time of the removal Father had not established

16

paternity, was actively using methamphetamine, had a warrant out for his arrest, was unable to participate in services due to his incarceration, and that he "has not been able to elevate his capacity despite the time allowed for him to do so." Id. at 32-33.

In C.M., six-year-old C.M. was shot by his older brother, leaving him paralyzed from the waist down, and C.M. was alleged to be a CHINS after it was discovered that C.M.'s mother, Nancy McKinney, frequently left him unattended. 675 N.E.2d at 1136. McKinney later filed a written admission to the CHINS allegations. Id. C.M. was adjudicated a CHINS, and in the dispositional order McKinney was ordered to participate in C.M.'s physical therapy, engage in supervised visitation, and participate in individual therapy, among other responsibilities. Id. The Office of Family and Children (the "OFC") filed a Petition for Involuntary Termination of McKinney's Parental Rights, and at the hearing the admitted CHINS allegations were presented as evidence supporting termination. McKinney claimed that the allegations in the CHINS petition were not true and that she had signed the written admission to the allegations "because her attorney told her that it was the only way C.M. could receive government services." Id. at 1136-1137. The court terminated her parental rights. Id. at 1137.

On appeal, McKinney did not challenge any of the elements the OFC was required to prove to effectuate a termination, but rather claimed that the OFC failed to prove the necessary elements by clear and convincing evidence, specifically arguing "that the trial court improperly relied on her admission to the allegations in the CHINS petition, which she repudiated during the termination proceedings, as the sole evidence to support the termination." Id. Such repudiated evidence included that she did not provide C.M. with

17

an adequate home. Id. The OFC argued that McKinney was barred by the doctrine of collateral estoppel from relitigating the facts admitted in the CHINS petition as to C.M.'s neglect. The OFC, like DCS in the instant case, cited to Adams, in which this court "held that collateral estoppel applied to prevent a father from arguing, during a termination hearing, that he had not sexually abused his daughter where he had previously contested the sexual abuse allegations in an earlier CHINS proceeding." Id. (citing Adams, 659 N.E.2d at 206).

In C.M., we began our analysis by observing the following:

Collateral estoppel operates to bar relitigation of an issue which was necessarily adjudicated in a former suit. Sullivan v. American Casualty Co., 605 N.E.2d 134, 137 (Ind. 1992). Where a party seeks to relitigate an issue, the first adjudication is conclusive even if the second action is on a different claim. Id.

In determining whether to apply the doctrine of collateral estoppel, Indiana courts have traditionally examined whether the party seeking estoppel established the following elements: (1) a final judgment in a former suit on the merits in a court of competent jurisdiction; (2) an identity of issues; and (3) the party to be estopped was a party in the prior action or in privity with that party. Bojrab v. John Carr Agency, 597 N.E.2d 376, 379 (Ind. Ct. App. 1992). However, the primary consideration in determining the appropriateness of allowing a party to assert collateral estoppel is whether the party against whom the judgment is pled had a full and fair opportunity to litigate the issue in a previous action and whether it would be otherwise unfair under the circumstances of the particular case to apply collateral estoppel. Tofany v. NBS Imaging Systems, Inc., 616 N.E.2d 1034, 1037-38 (1993). To make this determination, our courts consider the party's incentive and ability to litigate the prior action, including the interest at stake for the party in the previous proceeding and how the party perceived this interest. Id. at 1038.

Id.

18

We observed in C.M. that the Adams court "relied on the fact that the traditional elements of collateral estoppel—identity of issues, identity of parties and finality of judgment—had been met," but noted that "in light of the test enunciated in Tofany, 616 N.E.2d at 1038, which focuses on the parties' interest and motivation in litigating the prior proceeding, we find the rationale employed in Adams unpersuasive." Id. at 1137-1138. Specifically, we noted that a parent's interest in litigating a CHINS petition differs significantly from his or her interest in preventing the termination of their parental rights and that "a parent's perception of his or her interest in each proceeding may significantly differ . . . ." Id. at 1138. We held that collateral estoppel was inappropriate and that "McKinney was not estopped from challenging her admissions to the allegations in the CHINS petition during the termination hearing," but we also noted: "Nevertheless . . . McKinney's admissions were admissible to support the termination of her parental rights. However, collateral estoppel did not prevent McKinney from presenting evidence during the termination hearing to refute her prior admissions." Id.

Based upon C.M., the doctrine of collateral estoppel did not apply to prevent Father from presenting evidence at the termination hearing to refute any admissions he may have made at the CHINS stage *in an effort to prevent termination of his parental rights*. However, at the termination hearing and on appeal, Father is not simply attempting to relitigate the *facts*, or refute *admissions*, which led to the court adjudicating L.C. a CHINS; rather, Father argues that he should have had the opportunity at the termination hearing to ask the court to reconsider whether L.C. was ever a CHINS, and, if not, to effectively nullify or overturn its previous determination. At the termination

hearing, Father's counsel specifically argued to the court that "I again believe that you can litigate the CHINS. This was a stipulation. You can litigate whether a CHINS was ever necessary." Transcript at 77. This is not the rule of <u>C.M.</u> Under <u>C.M.</u>, parents such as Father may admit evidence at a termination proceeding in an effort to refute evidence previously admitted at the CHINS stage, but it does not allow a parent at a termination proceeding to have a second bite at the apple and attack a court's previous *legal conclusion* that the child was a CHINS. This conclusion is underscored by the fact that a petition for the termination of parental rights is a new cause of action filed under a separate cause number from the CHINS action.[9]

Indeed, Father does not point to a specific admission to an allegation in the CHINS petition that he attempted to refute at the termination hearing. Also, the court in its dispositional order noted that placement with Grandmother was considered but found to be inappropriate due to drug use in the home, which Father does not dispute. Father appeared by telephone at a hearing on April 19, 2012, in which he did not object to L.C.'s adjudication as a CHINS, and the court reaffirmed L.C.'s CHINS adjudication by order on April 30, 2012.

Likewise, on appeal, Father does not attempt to refute any admissions made at the CHINS stage. Rather, he simply suggests that it was error for DCS to take L.C. from Grandmother because L.C. was being adequately cared for by her.

---

[9] In this case, L.C.'s CHINS action was handled pursuant to cause number 82D01-1107-JC-366, and the termination petition was filed under cause number 82A01-1206-JT-70.

To the extent that Father suggests there is a jurisdictional issue in that L.C. was living in Kentucky with Grandmother and that accordingly any custody issue should have been handled in a Kentucky court, we note that "[l]ike the rest of the nation's courts, Indiana trial courts possess two kinds of 'jurisdiction.' Subject matter jurisdiction is the power to hear and determine cases of the general class to which any particular proceeding belongs. Personal jurisdiction requires that appropriate process be effected over the parties." K.S. v. State, 849 N.E.2d 538, 540 (Ind. 2006). Here, Father appears to challenge the trial court's personal jurisdiction over L.C. because L.C. was apparently residing in Kentucky. However, neither Father nor Mother (nor Grandmother) raised the issue of the court's personal jurisdiction over L.C. before the trial court, and both Father and Mother appeared before the court. Accordingly, any personal jurisdiction issue in this case has been waived. See Ellis v. M & I Bank, 960 N.E.2d 187 (Ind. Ct. App. 2011) (providing that a defendant can waive a lack of personal jurisdiction and submit to the jurisdiction of the court by responding or appearing and failing to raise the issue of lack of jurisdiction).

Next, we examine whether the court's judgment is clearly erroneous. In the Termination Order, the court concluded that there was a reasonable probability that the conditions which resulted in the removal of L.C. from the care of his parents will not be remedied, noting specifically that Mother voluntarily terminated her parental rights and that Father was serving an extended criminal sentence, has a pattern of instability, and has not met his parental obligations to date. As noted above, Father did not challenge the court's Findings of Fact. And in determining whether a reasonable probability exists that

the conditions justifying a child's continued placement outside the home will not be remedied, a court must not only judge a parent's fitness to care for his or her child at the time of the termination hearing and take into consideration evidence of changed conditions, but also, due to the permanent effect of termination, evaluate the parent's habitual patterns of conduct to determine the probability of future neglect or deprivation of the child. N.Q., 996 N.E.2d at 392. A parent's character is at issue in proceedings to terminate parental rights. See Matter of D.G., 702 N.E.2d 777, 780 (Ind. Ct. App. 1998). The findings provide ample evidence to support the trial court's conclusion that the conditions resulting in removal will not be remedied.

B.     Best Interests

We next consider Father's assertions that DCS failed to prove termination of his parental rights is in L.C.'s best interests. In determining what is in the best interests of a child, the trial court is required to look beyond the factors identified by the Indiana Department of Child Services and to the totality of the evidence. McBride, 798 N.E.2d at 203. In so doing, the court must subordinate the interests of the parent to those of the child. Id. The court need not wait until a child is irreversibly harmed before terminating the parent-child relationship. Id. Moreover, we have previously held that the recommendations by both the case manager and child advocate to terminate parental rights, in addition to evidence that the conditions resulting in removal will not be remedied, is sufficient to show by clear and convincing evidence that termination is in a child's best interests. In re M.M., 733 N.E.2d 6, 13 (Ind. Ct. App. 2000).

Initially, we note that although Father's brief contains language in a heading that "it is not in [L.C.'s] best interests for [F]ather's rights to be terminated," he does not make specific argument in this regard. Appellant's Brief at 13. Accordingly, Father has waived the argument. See Loomis v. Ameritech Corp., 764 N.E.2d 658, 668 (Ind. Ct. App. 2002) (holding argument waived for failure to provide cogent argument), reh'g denied, trans. denied; see also Ballaban v. Bloomington Jewish Cmty., Inc., 982 N.E.2d 329, 335 (Ind. Ct. App. 2013). Waiver notwithstanding, we will address whether termination of Father's parental rights is in L.C.'s best interests. DCS argues that it proved by clear and convincing evidence that termination of that relationship was in L.C.'s best interests, underscoring that Father is incarcerated and has not had stable housing between his multiple periods of incarceration, that Father left L.C. in Grandmother's care so that he could use methamphetamine, and that CASA Minnear and FCM Sitzman testified that they believed termination of Father's parental rights was in L.C.'s best interests.

In addition to the findings regarding Father's incarceration, his other children whom he has failed to support, his lack of stable housing, and his unemployment, the court specifically found that the CASA believed that termination was in the best interest of L.C. This finding is supported by the evidence presented at the termination hearing, in which CASA Minnear specifically testified that L.C. was "really bonded" with his foster family and would stop playing to give one of them a hug, and she recommended that "it would be best for him to be adopted by the foster family" because they provide him "a very stable loving home and his brother is there." Transcript at 95. In addition, FCM

Sitzman testified that L.C. appeared very comfortable, bonded with his foster family and was bonded with B.P., and that the foster family plans to adopt L.C. Accordingly, we conclude that there is sufficient evidence to support the trial court's determination that termination of Father's parental rights is in L.C.'s best interests. See, e.g., In re A.I., 825 N.E.2d 798, 811 (Ind. Ct. App. 2005) (testimony of court-appointed advocate and family case manager, coupled with evidence that conditions resulting in continued placement outside home will not be remedied, is sufficient to prove by clear and convincing evidence termination is in child's best interests), trans. denied.

## CONCLUSION

At the time of the termination hearing, L.C. was approximately two and one-half years old, and Father had been incarcerated for over one and one-half years. Father also was incarcerated at L.C.'s birth, and during the six-month period he was not incarcerated since the birth of L.C., he was using methamphetamine and left L.C. in the care of Grandmother rather than taking responsibility himself. This court will reverse a termination of parental rights "only upon a showing of 'clear error'—that which leaves us with a definite and firm conviction that a mistake has been made." Matter of A.N.J., 690 N.E.2d 716, 722 (Ind. Ct. App. 1997) (quoting Egly v. Blackford Cnty. Dep't of Pub. Welfare, 592 N.E.2d 1232, 1235 (Ind. 1992)). We find no error here.

Affirmed.

ROBB, J., and BARNES, J., concur.